# Illinois Official Reports

## Appellate Court

---

### *Vulpitta v. Walsh Construction Co.*, 2016 IL App (1st) 152203

---

| | |
|---|---|
| Appellate Court Caption | ANTHONY VULPITTA, Plaintiff-Appellant, v. WALSH CONSTRUCTION COMPANY and THE WALSH GROUP, Ltd., Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-15-2203 |
| Filed | September 2, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-11488; the Hon. Margaret A. Brennan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Law Office of William M. Walsh (William M. Walsh, of counsel), and Law Office of Paul Luka, P.C. (Paul Luka, of counsel), both of Chicago, for appellant.<br><br>Kelley Drye & Warren, LLP, of Chicago (Matthew C. Luzadder and John C. Pirra, of counsel), for appellees. |
| Panel | JUSTICE DELORT delivered the judgment of the court, with opinion. Presiding Justice Rochford and Justice Hoffman concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff Anthony Vulpitta sued defendants Walsh Construction Company (Walsh) and The Walsh Group, Ltd. (Walsh Group), for retaliatory discharge and discrimination on the basis of a work-related disability. The main issue presented in this appeal is whether Vulpitta filed his original underlying charges with the Department of Human Rights (Department) within 180 days of his termination as required by law. Vulpitta claims the defendants terminated him on July 11, 2012, which would make his charges timely; the defendants contend they terminated Vulpitta on May 24, 2012, which would make his charges untimely. The trial court granted summary judgment to the defendants, finding that Vulpitta was terminated on May 24, 2012. The court also found there were no material issues of fact supporting Vulpitta's retaliatory discharge claim. Vulpitta appeals, contending that the trial court made improper factual findings to resolve these claims. We disagree and therefore affirm.

¶ 2                                    BACKGROUND

¶ 3    The facts established by the depositions and pleadings in the record are as follows. Vulpitta worked for defendants as a carpenter and carpenter foreman from around June 2000 until May 24, 2012, when he was laid off due to a slowdown in construction activity. He testified that, as a foreman on small Walsh construction projects, he was able to hire a construction worker "for a week or so" but observed that requirements in the employee handbook made it difficult to do so and that a prospective employee was no longer a "Walsh guy *** if you missed 30 days." In other words, "If you were laid off for 30 days, you had to re[-]sign up with Walsh."

¶ 4    Around March 7, 2008, Vulpitta suffered a work-related injury to his left bicep and wrist. He received treatment and returned to work in August or September 2008 with various job restrictions recommended by his physician (primarily in the form of weight limitations and daily break periods), which defendants provided. Vulpitta testified that Patrick Easterday, his friend and supervisor, told him to take breaks as needed and that he was never denied a work break. He filed a workers' compensation claim as to these injuries on August 20, 2009. He did not dispute that defendants employed him on nine different construction projects from the time he filed the claim until his layoff on May 24, 2012.

¶ 5    Around August 15, 2011, Vulpitta suffered a work-related injury to his left hip and went to the hospital for an evaluation. He was examined and discharged to return to unrestricted work the following day. He went to his primary care physician the day after (August 17), but that physician also approved his return to work without restrictions.

¶ 6    On October 31, 2011, Vulpitta began working at defendants' construction project at the Spring Grove apartment complex, and Easterday was again his supervisor. In December 2011, defendants offered Vulpitta $80,000 to settle his 2009 workers' compensation claim, but he rejected the offer the following March.

¶ 7    Easterday testified at his deposition that, on May 24, 2012, Vulpitta was laid off from the Spring Grove project because the carpentry work was complete. Easterday further noted that Vulpitta was the last carpenter to be laid off. Easterday's secretary Michelle Griffin, who handled payroll for the project, stated that because no carpenters were paid after that date, carpentry work must have stopped at that time.

¶ 8        Vulpitta testified that, on May 24, Easterday had told him "Walsh was slow but that things would be breaking." Easterday did not recall making this statement to plaintiff. Vulpitta and Easterday, however, agreed that Vulpitta was the last carpenter to be laid off at the Spring Grove project, Easterday did not promise to rehire Vulpitta, and Easterday never indicated to Vulpitta that his layoff was only "temporary." Easterday further testified that, after May 24, he had no work for a carpenter foreman and did not hire any carpenters or carpenter foremen for the rest of 2012. Vulpitta, however, testified that he had heard from other carpenters that there was still carpentry work to be done at the Spring Grove project.[1] Vulpitta admitted that he only "heard rumors" and "believed" that there was a carpenter foreman still working on the Spring Grove project.

¶ 9        Vulpitta further admitted that, following the May 24 layoff, he no longer received any compensation or benefits from defendants. He also testified that he filed for unemployment benefits between May 24 and June 3, 2012, and listed the reason for being unemployed as "lack of work." He testified, however, that he believed that he was still "employed" by defendants because Easterday told him that "there would be something breaking."

¶ 10       On July 2, 2012, Vulpitta went to a third physician, Dr. Robert Fink, for treatment of his left hip pain. Dr. Fink ordered Vulpitta to undergo an X-ray examination that same day, the results of which indicated no fractures or dislocations. Dr. Fink then ordered an MRI of Vulpitta's pelvis, including both hips.

¶ 11       Vulpitta contacted Griffin the same day and told her that Dr. Fink needed the medical records and information relating to his August 15, 2011, treatment at Central DuPage Hospital for his "workmen comp claim." According to Vulpitta, Griffin retrieved that information for him that day, and Vulpitta passed it along to Dr. Fink. Griffin testified during her deposition, however, that she never had a conversation with Vulpitta regarding any information his doctor needed so that he could pursue a workers' compensation claim regarding his August 2011 injury. Griffin added that it was against company policy to provide any medical or injury documentation to anyone, even if it were an employee requesting his own documentation; instead, Griffin said she would "[p]erhaps" refer the employee to the insurance department. Griffin further confirmed that she never had a conversation with Easterday regarding Vulpitta's termination or workplace injuries, although she would ordinarily "apprise" Easterday of an employee's call regarding a workplace injury. Easterday testified that he was unaware as to whether Griffin and Vulpitta spoke regarding the need for plaintiff to obtain information about his August 2011 injuries. Easterday further noted that it was "doubtful" that Griffin would have told him of the conversation, because she would not have asked Easterday about any employee seeking his personal records.

¶ 12       On July 6, 2012, Vulpitta filed a workers' compensation claim for his August 2011 hip injury. Four days later, he underwent the MRI that Dr. Fink had ordered. The next day, July 11, 2012, Vulpitta and Easterday met for lunch. Easterday said that he had never met a laid-off employee for lunch before, but he and Vulpitta had been friends for many years. Vulpitta agreed that Easterday was a friend of his and added that they played on a hockey team together, that their families had spent holidays together, and that he and Easterday had met for lunch "a couple hundred times" before. According to Vulpitta, Easterday told him, "I have to let you

    [1]At the subsequent hearing on defendants' motion for summary judgment, the trial court declined to consider this evidence on hearsay grounds.

go," and "I don't want to do this. You know I have to do this. It's not coming from me, but I have to do this." Easterday did not recall making any of those statements. According to Easterday, he informed Vulpitta at the lunch that "nothing was breaking," that there were no openings for a carpenter foreman in the near future, and that Vulpitta should feel free to find a position elsewhere if necessary.

¶ 13    On July 16, 2012, Dr. Fink told Vulpitta that the results of the MRI also showed no fractures, bone chips, or dislocations. According to Vulpitta, Dr. Fink told him that a "different" MRI might show something, so sometime that summer, he saw a Dr. Kuhlman, who ordered a "Tesla" MRI. The results of that MRI showed that he had a "torn labrum," but he never reported those results to defendants.

¶ 14    Vulpitta recalled that, around June 2008, he learned that Easterday was going to terminate a labor foreman, Anestacio Ferralez,[2] because Ferralez had gotten "hurt a lot" and became a "liability." Vulpitta, however, admitted that he did not hear the conversation between Easterday and Ferralez and was not in the room when Ferralez was terminated. Easterday testified at his deposition that Ferralez was laid off because the work at the job site was complete and that Ferralez had announced his retirement to Easterday.

¶ 15    Finally, when asked what specific facts he had to support his claim that he was fired in retaliation for seeking a claim under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2012)), Vulpitta responded that it was Easterday's use of the "same words in our conversation as was [Ferralez's] conversation[:] that he had to let me go, that he didn't want to do this. He didn't want to have to fire me, but it's something he had to do." Vulpitta admitted that his employment could be terminated if work was "slow" and that, at the time of his layoff, work was slow.

¶ 16    On December 28, 2012, Vulpitta filed a charge of discrimination with the Department, alleging that defendants discriminated against him when it terminated his employment on the bases of retaliation and disability. On August 1, 2013, the Department dismissed Vulpitta's charges for lack of jurisdiction, finding that he filed them 218 days after his "discharge date of work" (May 24, 2012), which was more than the statutory time limit of 180 days after the commission of an alleged civil rights violation. Complainants aggrieved by an adverse decision of the Department have an option to file a complaint regarding the Department's decision with the Human Rights Commission (775 ILCS 5/7A-102(D)(3) (West 2012)) or by filing a civil action in the circuit court, which hears the claim *de novo* rather than by administrative review (775 ILCS 5/8-111(A) (West 2012)). The Department advised Vulpitta of these options in its dismissal order. He chose to bypass the Commission and proceed directly to circuit court. Accordingly, the part of this case regarding discrimination based on disability comes to us in a rather unusual stance. We must review whether a claim was filed timely with an administrative agency not based on the record made before the agency and under the deferential standards applicable to administrative review, but rather based on a factual record created at the trial court level.

¶ 17    On October 15, 2013, Vulpitta filed a three-count complaint against the defendants. Count I alleged retaliatory discharge, *i.e.*, that defendants terminated his employment in retaliation for his seeking benefits under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West

_____

[2]In the record, Ferralez's name is also spelled "Anastacio Forales" and "Anastacio Ferales." For the sake of clarity, we will use the spelling "Anestacio Ferralez," the spelling used in the complaint.

2012)). Counts II and III alleged unlawful discharge/refusal to accommodate based upon an actual (count II) or perceived (count III) disability, in violation of the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq.* (West 2012)).

¶ 18    On July 15, 2014, defendants filed their answer to the complaint. In response to Vulpitta's allegation that they continued to hire carpenters "[f]ollowing the termination of plaintiff's employment," defendants admitted that Vulpitta was laid off on May 24, 2012, and that Walsh hired carpenters "subsequent to May 24, 2012."

¶ 19    Defendants moved for summary judgment, arguing that counts II and III (alleging violations of the Act) were untimely because Vulpitta filed his original charges with the Department outside of the 180-day limitations period, and that count I (alleging retaliatory discharge) failed both because Vulpitta failed to establish causation and also because defendants had a valid nonpretextual reason for terminating him. Following a hearing, the trial court granted defendants' motion for summary judgment. This appeal followed.

¶ 20                                   ANALYSIS

¶ 21    On appeal, Vulpitta contends that the trial court erred in granting defendants' motion for summary judgment. Specifically, he argues that the trial court erred in finding that there was no genuine issue of fact that his employment termination date was May 24, 2012, and not July 11, 2012 (the date of his lunch with Easterday). Plaintiff claims that using the later date would preserve counts II and III because the underlying charges would have then been filed with the Department within the 180-day limitations period for claims under the Act. He also contends that count I should survive because of the temporal proximity—a mere five days—between the July termination date and the date he filed his workers' compensation claim relating to his August 2011 work-related injury.

¶ 22    Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). Summary judgment is a drastic measure and should only be granted when the moving party's right to judgment is "clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). To determine whether there is a genuine issue of material fact, we construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the opponent. *Id.* at 131-32. However, unsupported conclusions, opinions, or speculation are insufficient to raise a genuine issue of material fact. *Id.* at 132. We review a trial court's entry of summary judgment *de novo*. *Id.* at 102. Moreover, this court reviews the judgment, not the reasoning, of the trial court, and we may affirm on any grounds in the record, regardless of whether the trial court relied on those grounds or whether the trial court's reasoning was correct. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995).

¶ 23            The Disability Discrimination Claims (Counts II and III)

¶ 24    Vulpitta contends that the trial court erred in granting summary judgment on counts II and III for numerous reasons. First, he contends that the trial court erred in finding that he was "judicially estopped" from denying he was terminated on May 24, 2012, a finding based on his sworn statement in his application for unemployment benefits that he had been terminated on that date due to a lack of work. Vulpitta further faults the trial court for discrediting his

testimony regarding Easterday's alleged statements to him at their July 11, 2012, lunch. He also argues that the trial court erred in finding that an employee who has been temporarily laid off has been terminated for purposes of claims under both the Act and the Workers' Compensation Act. Finally, he argues that he reasonably believed that he had not been "permanently terminated" on May 24, 2012, based upon both Easterday's purported comments to him that "new work would be breaking soon" and also his history of "temporary layoffs after which Easterday recalled him to work."

¶ 25    The Act prohibits employment discrimination on the basis of a disability. 775 ILCS 5/1-101 *et seq.* (West 2012); *Raintree Health Care Center v. Illinois Human Rights Comm'n*, 173 Ill. 2d 469, 479 (1996). In addition, "where the Act provides coverage, it is the exclusive remedy for employment discrimination." *Baker v. Miller*, 159 Ill. 2d 249, 256 (1994). With certain exceptions not relevant here, "no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8-111(D) (West 2012).

¶ 26    Section 7A-102 of the Act provides that charges of civil rights violations must be filed with the Department within 180 days after the date of the commission of the alleged violation. 775 ILCS 5/7A-102(A)(1) (West 2012). Compliance with the statutory time limit is a condition precedent to the right to seek a remedy and is a prerequisite to the Commission's acquisition of subject matter jurisdiction. *Weatherly v. Illinois Human Rights Comm'n*, 338 Ill. App. 3d 433, 437 (2003). Accordingly, even though the trial court considered Vulpitta's charges *de novo*, if he did not originally file them with the Commission on time, he is precluded from pursuing them in the circuit court.

¶ 27    The undisputed facts outlined above lend ample support to the trial court's conclusion that Vulpitta was terminated on May 24, 2012, for the purpose of determining whether his charges were timely. These facts include the following: (1) Easterday's testimony that Vulpitta was laid off on May 24 because the Spring Grove carpentry work was complete, (2) Vulpitta was the last carpenter to be laid off of that job and received no pay after that date, (3) Easterday's testimony that Walsh had no further work for carpenters in 2012, and (4) Vulpitta's filing for unemployment benefits immediately after the May 24 layoff. Vulpitta challenges the underpinnings of some of these facts, but below, we explain that none of his contentions are meritorious.

¶ 28    We first review Vulpitta's contentions that the trial court found that he was estopped from claiming the July termination date because he had used the May date on his unemployment application. Under the doctrine of judicial estoppel, "[t]he party to be estopped must have (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it." *Seymour v. Collins*, 2015 IL 118432, ¶ 37.

¶ 29    Contrary to Vulpitta's contentions, the record reveals that the trial court never specifically barred his contention that he was terminated on July 11, 2012, based on judicial estoppel. The court simply referenced Vulpitta's deposition testimony—in which he agreed that, when he filed his unemployment compensation claim, he had been terminated on May 24 for lack of

work—and merely observed that he could not really "back away" from that sworn statement.[3] Because we can affirm on other grounds, we decline to address the issue of whether Vulpitta's statement on his unemployment application might have estopped him from claiming a later termination date.

¶ 30 The trial court characterized Vulpitta's claim that his termination date was July 11, 2012, the day he met Easterday for lunch, as "at best disingenuous," "creative[,] and a significant reach." Vulpitta claims these statements amounted to an improper credibility determination regarding this testimony. Indeed, a trial court cannot weigh evidence, decide facts and make credibility determinations at the summary judgment stage. *Gulino v. Economy Fire & Casualty Co.*, 2012 IL App (1st) 102429, ¶ 25. However, we do not believe that the trial court was making a credibility determination to resolve the conflict between the two possible termination dates. Instead, it appears that the court was criticizing the viability of the legal conclusion that Vulpitta reached based on the undisputed evidence in the summary judgment record. At any rate, we review the judgment, not the reasoning, of the trial court, and we may affirm on any basis in the record, regardless of whether the trial court relied upon it and regardless of the correctness of the trial court's reasoning. *Leonardi*, 168 Ill. 2d at 97.

¶ 31 The evidence demonstrates that Vulpitta was terminated in May. At the lunch meeting, plaintiff merely testified that Easterday told him, "I have to let you go," and "I don't want to do this. You know I have to do this. It's not coming from me, but I have to do this." Easterday recalled that he only informed plaintiff at the lunch that "nothing was breaking," that there were no openings for a carpenter foreman in the near future, and that plaintiff should feel free to find a position elsewhere if necessary. These statements, even taken as true, do not create an issue of material fact as to the date Vulpitta was terminated. Therefore, regardless of the trial court's characterizations, these statements lend no factual support to Vulpitta's claim regarding the later termination date.

¶ 32 Vulpitta's third argument is that a temporary layoff does not equate to a termination for claims under the Act and the Workers' Compensation Act. Easterday's hopeful comment that another construction project would begin at some unspecified point in the near future (or in his terms, "something would be breaking soon") was not enough to establish that Walsh failed to make a final decision to terminate Vulpitta's employment and that Walsh failed to give him unequivocal notice of his termination. Here, Vulpitta—an at-will employee—was told that he was laid off on May 24, 2012, and he no longer received wages or benefits from Walsh as of that date. He also acknowledged in his deposition that: there was no promise of permanent employment; there was no promise to rehire him; there was no statement that his layoff was only temporary; he filed for unemployment benefits, based upon a lack of work; he could be terminated "if Walsh was slow" (*i.e.*, for lack of work); and "things were slow" at the time of his layoff.

---

[3] The record only includes plaintiff's deposition testimony regarding his application for unemployment benefits and does not include the actual application. Plaintiff, however, does not challenge either the trial court's or defendants' claim that his statements to IDES were made under oath. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (holding that an appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record, "it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis").

¶ 33        Along the same line, Vulpitta contends that Walsh did not make the finality of the May 24 layoff sufficiently clear to him so as to put him on notice of an impending deadline to file charges. Vulpitta cites *Paradise v. Augustana Hospital & Health Care Center*, 222 Ill. App. 3d 672, 676 (1991), for the proposition that "sufficient notice [of a termination] is that which clearly discloses to persons of ordinary intelligence what is intended." Even so, the *Paradise* court rejected an argument similar to that Vulpitta makes here, finding that the letter at issue, which terminated a consulting agreement, "constituted sufficient notice because it clearly disclosed to a person of ordinary intelligence that defendant intended to terminate the contract." In light of the closing of the carpentry work at the Spring Grove project, we cannot discern how anyone in Vulpitta's place would have understood the May 24 discussion with Easterday as anything but a termination.

¶ 34        Nonetheless, relying upon a federal decision, *Flannery v. Recording Industry Ass'n of America*, 354 F.3d 632 (7th Cir. 2004), Vulpitta argues that there was not a " 'final, ultimate, non-tentative decision to terminate' " his employment and that he did not receive clear and unequivocal notice that defendants intended to "end their employment relationship with [p]laintiff." We are unpersuaded by Vulpitta's reliance upon *Flannery*. Decisions of federal district or circuit courts are not binding on Illinois courts. *Prodromos v. Everen Securities, Inc.*, 389 Ill. App. 3d 157, 175 (2009) (citing *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 302 (2001)). More importantly, however, *Flannery* is distinguishable.

¶ 35        In *Flannery*, the plaintiff alleged that his supervisors told him in a March 2000 meeting that he would have to leave his employment because of his age and bad health, but when the plaintiff responded that he did not want to leave, "[a]t that point, *they told him that they would keep him on and see how things went*." (Emphasis added.) *Flannery*, 354 F.3d at 636. In June 2001, however, the plaintiff was informed that he would be (and was) terminated effective October 1, 2001; the plaintiff then filed his claim with the Equal Employment Opportunity Commission (EEOC) on October 22, 2001. *Id.* The federal trial court, however, found that the 300-day limitations period began as of the March 2000 meeting and that the plaintiff's claims were time-barred. *Id.* The Seventh Circuit Court of Appeals reversed, holding that the defendant's acquiescence in allowing the plaintiff to continue working after the March 2000 meeting rendered it "at least *** plausible" that the decision to terminate the plaintiff was June 2001, making the EEOC claim timely. *Id.* at 640-41. Here, by contrast, defendants did not acquiesce in Vulpitta's continued employment past May 24, 2012, and Vulpitta does not dispute that he was laid off by defendants on that date and was no longer receiving a salary or employment-related benefits thereafter. His reliance upon *Flannery* is therefore unavailing.

¶ 36        Vulpitta's last argument is that he "reasonably believed" that he would be rehired after May 24 based upon Easterday's purported statement that new work would be "breaking" soon, and as such, his termination date should be July 11, when Easterday informed him that nothing would be breaking. This claim, however, also fails. At his deposition, Vulpitta freely admitted that, if you were laid off for 30 days or more, you were no longer a "Walsh guy" and had to "re[-]sign up" with Walsh. Therefore, based upon his own deposition testimony, Vulpitta could no longer consider himself a Walsh employee as of June 23, 2012 (*i.e.*, 30 days after May 24, 2012), and he had to file his claim of discrimination under the Act by December 20, 2012 (180 days after June 23, 2012). However, he filed his discrimination claim on December 28, 2012. As noted above, the Act is the "exclusive remedy" for employment discrimination claims (*Baker*, 159 Ill. 2d at 256), and no court has jurisdiction "over the subject of an alleged

civil rights violation other than as set forth in th[e] Act" (775 ILCS 5/8-111(D) (West 2012)). It follows perforce that since Vulpitta's claim with the Department was untimely, the trial court did not have statutory jurisdiction over the counts seeking remedies created by the Act. Therefore, the trial court correctly entered summary judgment on these counts in favor of defendants.

¶ 37                                     Retaliatory Discharge Claim (Count I)

¶ 38        Vulpitta also challenges the trial court's granting of summary judgment in favor of defendants on his retaliatory discharge claim. Specifically, he argues that the trial court erred in finding that no genuine issue of fact that his employment termination date was May 24, 2012, and not July 11, 2012, because the later date was only five days after he filed his workers' compensation claim relating to his injury from the prior August. Vulpitta explains that: On July 2, he asked Griffin (Easterday's secretary) for his medical record to process his claim; on July 6, he filed his claim; and then on July 11, he had lunch with Easterday, during which Easterday "permanently discharged" him and said there were no new construction projects "breaking." Vulpitta imputes Griffin's alleged knowledge of his worker's compensation claim to Easterday.

¶ 39        As a general rule, an employer in Illinois may discharge an at-will employee at any time and for any reason. *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29, 32 (1994). In *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 181-85 (1978), however, our supreme court carved out a limited exception to this rule and recognized an employee's right to file a retaliatory discharge claim if he was fired for seeking workers' compensation benefits. To state a claim for retaliatory discharge, a plaintiff must establish the following elements: (1) he was an employee of the defendant at or before the time of the injury; (2) he exercised some right under the Workers' Compensation Act; and (3) his discharge was causally related to the exercise of his rights under the Workers' Compensation Act. *Grabs v. Safeway, Inc.*, 395 Ill. App. 3d 286, 291 (2009). The element of causation is not met, however, if the employer has a valid, nonpretextual basis for discharging the employee. *Clemons v. Mechanical Devices Co.*, 184 Ill. 2d 328, 336 (1998). With respect to the element of causation, "the ultimate issue to be decided is the employer's motive in discharging the employee." *Id.*

¶ 40        In this case, the trial court properly granted defendants' motion for summary judgment because Vulpitta failed to establish a causal connection between his exercise of his rights under the Worker's Compensation Act and his discharge. Vulpitta's first reported work-related injury occurred in March 2008, and he returned to work in August or September of that year with restrictions involving the need to take multiple work breaks and a limit on the amount of weight he could lift. Vulpitta admitted that he was never denied a work break, and defendants consistently accommodated his restrictions. In addition, Vulpitta does not challenge defendants' claim that he was continuously employed on nine different construction projects between the date he filed his workers' compensation claim (August 20, 2009) and the date of his layoff for lack of work (May 24, 2012). While it is true that the mere passage of time will not *per se* insulate an employer from a retaliatory discharge claim (see *Netzel v. United Parcel Service, Inc.*, 181 Ill. App. 3d 808, 813 (1989)), the undisputed facts in this case, including Vulpitta's continued work on at least nine different construction projects and the employer's allowance of his work restrictions, amply support the trial court's finding that Vulpitta's termination was not retaliatory.

¶ 41 In addition, Vulpitta's claim that he was permanently discharged in July 2012 (and implicitly in retaliation for his filing for benefits in August 2011) also fails for lack of causation. Easterday testified that Vulpitta was the last carpenter to be laid off from the Spring Grove project because the carpentry was complete, and Easterday further testified that, after May 24, he had no work for a carpenter foreman and did not hire any carpenters or carpenter foremen for the rest of 2012. This testimony was corroborated by both Vulpitta, who agreed that he was the last carpenter to be laid off, and Griffin, who stated that she no longer saw any carpenters listed on the payroll sheet after May 24, 2012.

¶ 42 Vulpitta claims that, when he contacted Griffin and asked for his medical records for his August 2011 workers' compensation claim (July 2, 2012), it was only a few days prior to his July 12 lunch with Easterday, which Vulpitta characterizes as the date of his "permanent discharge." Vulpitta then implies that Griffin provided this information to Easterday, who then "permanently" terminated Vulpitta in retaliation for filing this claim. Setting aside Griffin's denial of having had any such conversation with Vulpitta, he cannot establish that Griffin communicated this information to Easterday.[4] Easterday could not recall ever having a conversation with Griffin regarding Vulpitta and stated that it was "doubtful" that she would have discussed that with him because she would not have asked Easterday about any employee that was seeking his or her own personal records.

¶ 43 Vulpitta relies on the similarity between Easterday's purported rationale for terminating Ferralez (purportedly because Ferralez was "getting hurt a lot") and the statements made to him in July. However, Vulpitta admitted that he was not present when Ferralez was terminated and thus cannot contradict Easterday's testimony that Ferralez was terminated because work at the job site was complete and Ferralez retired afterwards.

¶ 44 Finally, Vulpitta testified that the only fact supporting his claim was Easterday's statement at their lunch that Easterday had to let Vulpitta go but did not want to. This does not contradict Easterday's testimony that he met with Vulpitta to explain that new work was not, in fact, breaking soon and that Vulpitta should seek alternate employment if necessary. In sum, Vulpitta's evidence failed to establish a retaliatory motive as the cause of his termination. The trial court thus properly granted summary judgment in favor of defendants because unsupported conclusions or speculation cannot create a genuine issue of material fact. *Outboard Marine*, 154 Ill. 2d at 132.

¶ 45 Vulpitta, however, replies that it was "undisputed" that Walsh hired carpenters after his layoff, but we note that Vulpitta's complaint merely asserted that Walsh did so "[f]ollowing" his layoff, and Walsh agreed to this vague assertion: Walsh's answer, filed on July 15, 2014, agreed that, "subsequent to" Vulpitta's layoff in May 2012 (and prior to the filing date of the answer to the complaint), Walsh did hire carpenters. Similarly, although Vulpitta testified that other carpenters told him that there was additional work to be done at Spring Grove, Vulpitta conceded that he only heard rumors and merely "believed" that there was another carpenter

---

[4] In his reply brief, Vulpitta asserts that Griffin testified at her deposition that she "advised Easterday of all work-related phone calls, including calls regarding workers' compensation matters." She did not. The portion of the record Vulpitta cites merely indicates that Griffin would advise Easterday of work-related matters and *workplace injuries*. Matters involving a *workers' compensation claim* would "[p]erhaps" be referred to the Insurance Department because "company policy" prohibited Griffin from providing any individual with documentation.

foreman that was still working on that project. In sum, there is nothing in the record that either established that Walsh hired these carpenters shortly after plaintiff's layoff or contradicted Easterday's statement that, after May 24, he did not hire any carpenters or carpenter foremen for the rest of 2012. This argument also fails to create an issue of fact because it is too speculative. See *id.* Vulpitta's final contention of error is therefore without merit.

¶ 46                                    CONCLUSION

¶ 47        The trial court properly granted summary judgment in favor of defendants on plaintiff's retaliatory discharge claim because he failed to establish causation. The court also properly granted summary judgment to defendants on the discrimination claim because the plaintiff did not assert it in a timely manner. Accordingly, we affirm the judgment of the trial court.

¶ 48        Affirmed.