2025 IL App (1st) 230936-U

THIRD DIVISION
June 25, 2025

Nos. 1-23-0936, 1-23-1364 cons.

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| ANTHONY POLINSKI, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 2019 L 009721 |
| | ) | |
| MICHAEL OLSZEWSKI and PROPERTY HOLDINGS, LLC; | ) | |
| | ) | |
| | ) | Honorable John J. Curry, |
| Defendants-Appellants. | ) | Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Justices Reyes and Martin concurred in the judgment.

**ORDER**

¶ 1   *Held:*   Defendants are not entitled to judgment notwithstanding the verdict (JNOV) or a new trial. The trial court's findings were not against the manifest weight of the evidence, and the court's conduct of the trial was not otherwise improper. The court did not err in calculating damages. Defendants were not improperly denied a jury trial. Affirmed.

¶ 2   Plaintiff Anthony Polinski filed a complaint against defendants Michael Olszewski and Property Holdings, LLC (Holdings) alleging breach of contract (counts I and III), common law fraud (count II), and unjust enrichment (count IV), in connection with a $70,000 unpaid promissory note. Following a bench trial, the court found in favor of plaintiff on counts I and II, found that

counts III and IV (which plaintiff had pleaded in the alternative) were "moot," and awarded $1,748,250 in damages in favor of plaintiff. On appeal, defendants contend that (1) they are entitled to JNOV on count I (alleging breach of contract) and count II (alleging fraud); (2) they are entitled to a new trial on counts I and II because the trial court's factual findings were against the manifest weight of the evidence; (3) in the alternative, they are entitled to a new trial or a reduction of awarded damages; and (4) in the alternative, the court's conduct of the trial entitles them to a new trial. For the following reasons, we affirm the judgment of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4                                 A. Pretrial Proceedings

¶ 5      Plaintiff filed his initial complaint against defendants on September 3, 2019, alleging the following. Defendant Olszewski, the managing member of Holdings, requested a short-term $70,000 loan from plaintiff in April 2019. Plaintiff's attorney, John Kantor (Kantor), negotiated and communicated the loan terms, and on April 4, 2019, defendant[1] agreed to the terms of the $70,000 loan, which included interest at a rate of $7,000 per week, and a repayment due date of April 11, 2019. Defendant required that the funds be provided before 3 p.m. on April 4, 2019. Plaintiff's attorney e-mailed a note reflecting these terms to defendant, who told plaintiff's attorney that he had signed the note and would provide the executed copy of the note to Kantor on April 5, 2019. As stated in paragraph 11 of plaintiff's complaint, "in reliance on [defendant's] representation and instruction, [p]laintiff wire transferred *** $70,000.00 to the account of *** Holdings *** on April 4, 2019 at 2:25 p.m."

---

[1] Olszewski is the sole and managing member of Holdings. Accordingly, for the sake of clarity, we refer to Olszewski throughout as "defendant." Holdings and Olszewski collectively are referred to as "defendants."

¶ 6    The next day, Kantor met with defendant, who gave Kantor the note that defendant had signed.  Upon inspection, Kantor noticed that defendant had altered the note in multiple respects. Plaintiff attached two exhibits to his verified complaint:  exhibit A, an unsigned note for $70,000, which plaintiff alleged was the note that Kantor had sent defendant on April 4, 2019 (and which Kantor believed defendant had signed); and exhibit B, the signed note for $70,000, which plaintiff alleged defendant had altered (and which Kantor had received from defendant).

¶ 7    The unsigned note differs from the signed note as follows.  Section 1 ("Borrower's Promise to Pay") indicates that defendant and Holdings are executing the promise to repay the $70,000 in principal and $7,000 in interest on April 11, 2019; whereas that section in the signed note indicates that only Holdings is promising to repay the note.  Section 2 ("Interest") in the unsigned note indicates that defendants will owe $7,000 in interest "per each and every week under this note"; in the signed note, this entire section is missing.  Section 2 of the signed note begins with what is section 3 of  the unsigned note.  In addition, section 5 of the unsigned note ("Loan Charges") states, "Borrower shall also be responsible for and pay all costs and expenses, including attorney's fees, for the preparation and recording of the original note and/or mortgage," but this entire section is also missing in the altered (*i.e.*, signed) note.

¶ 8    Section 6 of the unsigned note, entitled "Borrower's Failure to Pay as Required,"[2] provides in relevant part as follows:

> "(A) Late charge for overdue payments- $250.00 per day
>
>  (B) Default

---

[2]  Although this section in the unsigned note immediately follows section five and precedes section seven, it is (presumably) erroneously numbered as section nine.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice [was] delivered or mailed to me. The borrower will pay $250.00 a day during said default period until cured.

* * *

(E) Payment of Note Holder's Cost and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees, court costs and any costs of preparing said note. I shall also pay all lender costs and fees/ [sic] including attorney's fees incurred in preparing and funding this loan and any subsequent payoff of same."

Finally, the signature line of the unsigned note indicates that it is being signed by "Michael Olszewski, individually, and as managing member of Property Holdings LLC."

¶ 9 The signed note (exhibit B), however, does not contain any provision that overdue payments must include a $250 daily late charge, either in subsection A or subsection C; instead, section 6 of the signed note begins with subsection A entitled "Default," as provided below:

4

"(A) Default

(B) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice [was] delivered or mailed to me."

Subsection E of the signed note is also entitled, "Payment of Note Holder's Cost and Expenses," but there is no text following that heading. Finally, the signature line of the signed note indicates that it is being signed by defendant solely "as managing member of Property Holdings LLC."

¶ 10    Both the unsigned and altered/signed notes contain a section entitled, "Loan Charges," which provides in relevant part as follows:

"If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the Interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit ***."

This section adds that any excess amounts already collected would be refunded to the borrower.

¶ 11    On January 24, 2020, counsel for defendants, Stephen Peck, filed his appearance with the trial court but did not check the box on the form indicating a jury demand. On December 21, 2020, Richard Carbonara (Carbonara) filed an appearance on behalf of defendant and Holdings with the court. Carbonara checked boxes indicating both that this was an "additional appearance" and that

he was making a jury demand. On December 28, 2020, the court entered orders allowing Peck to withdraw as counsel for defendants and granting a "motion to substitute counsel."[3]

¶ 12    Plaintiff filed his first amended verified complaint against defendants on December 6, 2021.[4] Plaintiff's first amended verified complaint made substantially the same factual allegations as those in his initial complaint (including paragraph 11), but the amended complaint added two counts that he pleaded in the alternative:  Breach of Contract against Holdings (count III) and Unjust Enrichment against both defendants (count IV).

¶ 13    On January 3, 2022, defendant filed his verified answer to plaintiff's complaint. Defendant's response to paragraph 11 of plaintiff's complaint stated in part as follows:

> "11.  That pursuant to said agreement, and in reliance on Olszewski's representation and instruction, [p]laintiff wire transferred the amount of $70,000.00 to the account of [d]efendant *** Holdings *** on April 4, 2019 at 2:25 p.m.
>
> **Answer:**  Defendants admit that *** Holdings *** received $70,000.00 on or about April 4, 2019[,] after Olszewski signed and delivered to Kantor at [d]efendants' office in Cicero, Illinois the [n]ote actually involved."

Defendants did not allege any affirmative defense in their answer.

¶ 14                              B. The First Day of Trial

¶ 15    On June 23, 2022, the bench trial began. The bystander's report for this day of trial reveals the following. Plaintiff testified that, on April 3 or 4, 2019, his attorney, Kantor, called him to see

---

[3] The record does not include a motion to substitute counsel concerning these attorneys.

[4] Although plaintiff failed to attach a copy of the original and altered notes to his December 2021 filing, he subsequently included that exhibit when he re-filed the first amended complaint on January 12, 2022.

if plaintiff was interested in providing a short-term $70,000 loan to defendants. Plaintiff did not know defendant and never communicated directly with him. Plaintiff said that Kantor knew defendants and that other clients of Kantor's had done business with them. Plaintiff responded that he would agree to the loan if it was only for one week and told Kantor to negotiate the terms and draft the note. Kantor handled all communication with defendant.

¶ 16 On April 4, 2019, Kantor advised plaintiff of the loan negotiations. According to plaintiff, Kantor told him that defendants had agreed to repay the $70,000 loan with $7,000 per week of interest by April 11, 2019. Plaintiff also testified that, in his discussions with Kantor as to the loan terms, both defendant and Holdings would be co-borrowers on the note.

¶ 17 He was also advised that defendants needed the money to be wired to their account by 3 p.m. that day. Based upon defendants' agreement to the terms, plaintiff initiated a wire transfer of $70,000 to the account of Holdings. Plaintiff confirmed that, as of the date of trial, defendants had repaid neither the loan nor the interest and late fees.

¶ 18 Defendant then testified as an adverse witness. Defendant stated that he is the sole managing member of Holdings, which acquires single- and multiple-family residential properties from various banks, renovates them, and then sells them.

¶ 19 Regarding the loan at issue, defendant recalled that all negotiations were conducted with Kantor either by phone, text, or e-mail. Defendant admitted that, at 1:54 p.m. on April 4, 2019, he received an e-mail from Kantor with the note that Kantor had drafted attached. The note was admitted into evidence and stated, *inter alia*, that *defendants* would pay $7,000 in interest "each and every week." The note also stated that principal and interest of $77,000 was to be paid on or before April 11, 2019, and there would be a late charge of $250 per day for overdue payments.

¶ 20    Defendant testified that, on April 4, 2019, he sent Kantor a text stating, "Ok money needs to hit the account today call me.  Before 3pm."  Defendant agreed that this text was in response to Kantor's text, which stated as follows:

> "Mike, He [*sic*] will do $7k [*sic*] for one week only.  He has other obligations with the money … if you are 100% sure you will return in a week let's do it.  Otherwise he suggests you look elsewhere for the money.  It's the best I can get out of him.  Let me know ASAP."

Defendant confirmed that these text messages between him and Kantor were true and correct copies of the text messages between him and Kantor on that same date.

¶ 21    Defendant further testified that he received the $70,000 loan *prior to* providing the signed note to Kantor.  The Court took judicial notice that this testimony contradicted defendant's answer to paragraph 11 of plaintiff's first amended complaint, which stated that he received the funds *after* signing and delivering the note to Kantor.

¶ 22    Defendant testified that he delivered a signed note to Kantor on April 8 or 9, 2019.  He admitted that he received the $70,000 into the account of Holdings per the wire instructions that he provided to Kantor.  Defendant also admitted that both the signed and unsigned notes indicated that the money had to be repaid by April 11, 2019, and that the amount to be repaid by that date, including interest, was $77,000.  He conceded that the $77,000 had not been repaid and further admitted that plaintiff "deserved to get his money."  Although defendant stated that he intended to be bound by the terms of the note that he signed, he said that the loan was for one year even though the note he signed had a due date of April 11, 2019.

¶ 23    Defendant testified that there was never any problem regarding funds to repay plaintiff and that funds were always available.  He admitted, however, that, at various times, the daily and

ending balances indicated the bank statements for Holdings were less than the amount required to repay the money due plaintiff. Finally, defendant conceded the 2018 property taxes on his residence, although due in March and August 2019, were paid at the end of October 2019.

¶ 24 Zigniew Kazmierczak (Kazmierczak) next testified that he had known defendant since 1998 or 1999 and bought multiple properties from defendants over the years. Kazmierczak knew defendant to be a real estate broker who owned a real estate investment company, represented banks with respect to distressed properties, and bought properties from the banks.

¶ 25 Kazmierczak testified that, at around 9 a.m. on April 3, 2019, defendant contacted him to ask for an immediate loan of $70,000 to be repaid in one week. According to Kazmierczak, defendant wished to close on a real estate investment that offered a potentially high rate of return. Specifically, this investment involved a large, foreclosed property block that had to be funded and closed on April 4, 2019, and defendant needed $70,000 to fulfill the funding requirements of his participation. Although Kazmierczak did not have that amount of money available, he stated that he would try to find someone who could fund such a loan.

¶ 26 Kazmierczak recounted that defendant called him again around noon on that same day and asked Kazmierczak for an update. Kazmierczak responded that he had left a voicemail for Kantor, whom Kazmierczak had known for 20 years. Kazmierczak said that Kantor had represented him in previous real estate closings, including the purchase of properties from defendant. Kantor returned Kazmierczak's call, and Kazmierczak told Kantor of defendant's financing needs.

¶ 27 Kantor then testified that he was an attorney licensed to practice in Illinois since 1991 and had known plaintiff since 1985 or 1986, having represented plaintiff in real estate closings and real estate tax appeals. He had known defendant for about 20 years and represented clients who had purchased properties from defendant. He understood that defendant invested in distressed properties and acted as a broker for banks selling foreclosed properties. Kantor said that he had

never acted as an attorney for defendant or any of defendant's companies. Kantor testified that he had known Kazmierczak for about 20 years, longer than he had known defendant, and that he had also represented Kazmierczak in real estate transactions.

¶ 28 Kantor then stated that, on April 3, 2019, Kazmierczak contacted him and said that defendant was looking for a short-term loan in the amount of $70,000. Kantor responded that he might know people interested in funding such a loan and proceeded to contact them. Kantor called defendant, and when he asked if defendant would be interested in any person Kantor could recommend, defendant said yes.

¶ 29 Kantor contacted a few people including plaintiff. Kantor testified plaintiff authorized Kantor to represent him with regard to the loan. According to Kantor, from that point on, he was acting as plaintiff's agent to finalize the agreement to loan money to defendants. Kantor recalled that plaintiff's instruction to him was to obtain an agreement that would ensure that the loan would be repaid within seven days with generous interest.

¶ 30 Kantor spoke to defendant on April 4, 2019, and told defendant that the loan was for just one week. Kantor said that he made at least one proposal to defendant on or before April 4, 2019, suggesting in one proposal a return of $20,000 in addition to the funds provided and payable in one week, but defendant rejected this proposal. Kantor added that defendant stated that he absolutely required delivery of the funds by the afternoon of April 4, 2019.

¶ 31 Based upon his discussions with defendant, Kantor drafted a revised note for a loan of $70,000 with $7,000 in interest per week and with the principal and interest payable one week later on April 11, 2019. This revised note, which was admitted into evidence, stated that, *inter alia*, both defendants (defendant and Holdings) would pay $7,000 in interest "each and every week." Kantor e-mailed this note to defendant and then called defendant to confirm that defendant had received the e-mail and attached note. Kantor discussed the contents of the note with

defendant by telephone and told defendant that defendant had to sign the note before the funds could be transferred. According to Kantor, defendant stated in that call that defendant agreed to the terms, signed the note, and reminded Kantor that the funds had to be transferred by 3 p.m. that day. After providing the wire instructions during that phone call, defendant again affirmed that the loaned amount with interest would be repaid in a week.

¶ 32    After plaintiff informed Kantor that the wire transfer of $70,000 to Holdings was sent, Kantor informed defendant that the funds transfer was completed. Kantor then sent a text message to defendant at 4:04 p.m. on that same day (April 4, 2019) asking for a text message or e-mail with an image of the signed note. Kantor also offered to pick up the original signed note from defendant's office. Defendant sent Kantor a text message suggesting that they meet at defendant's restaurant at noon the next day (April 5, 2019), where defendant would give Kantor the signed note and treat Kantor to lunch.

¶ 33    Kantor met defendant at the restaurant at around 12:30 p.m. on April 5, 2019. Defendant gave Kantor an envelope that defendant said contained the signed note. Kantor did not open the envelope at that time. Kantor said that defendant left the restaurant immediately after delivering the envelope and that defendant did not treat him to lunch.

¶ 34    Kantor then left the restaurant, and later that afternoon, he examined the contents of the envelope. Kantor noticed that the note in the envelope (with defendant's signature) was not the note that he prepared and e-mailed to defendant to sign on April 4, 2019, because the note in the envelope contained different terms than the note he prepared and sent to defendant. Kantor explained that the altered note was signed only by defendant on behalf of Holdings and did not include defendant's personal guarantee. Kantor added that the altered note (again, signed by defendant) stated that defendant would pay a total amount of only $77,000 representing principal

11

and interest on or before April 11, 2019. Kantor realized that if defendant repaid the loan on April 11, 2019 (the repayment date on both notes), none of the altered terms would matter.

¶ 35    Kantor then testified that, on the afternoon of April 5, 2019, he called defendant and accused defendant of altering the note, but defendant "hung up on" Kantor. Kantor then sent a text message to defendant with wire instructions for the repayment of the $77,000 loan plus interest due on April 11, 2019. Kantor said that he sent additional text messages to defendant regarding the repayment on the loan on both April 10 and April 11, 2019. Defendant, however, never responded. On April 19, 2019, Kantor then sent another text message to defendant reiterating the terms of the note he had sent to defendant. A copy of these text message exchanges, as well as exchanges occurring through November 18, 2019, were entered into evidence.

¶ 36    Kantor said that the note was never repaid, so he mailed a formal notice of default to defendant on June 8, 2019. Plaintiff then rested.

¶ 37                   C. Continuances Following the First Day of Trial

¶ 38    On June 24, 2022, the trial court entered an order setting the second and final day of trial for August 2, 2022, so that defendants could present their case in chief. On August 2, 2022, the court entered an order stating that the cause came before the court on defendants' emergency motion to continue trial.[5] The court allowed defendants' emergency motion, striking the existing trial date of August 2, 2022, and continuing the matter to August 22, 2022.

¶ 39    On August 22, 2022, the trial court entered an order directing defense counsel to submit a physician's letter on or before September 9, 2022, "reporting counsel's ability to attend trial," and setting the matter for trial on October 24, 2022. According to the court's subsequent order denying defendant's posttrial motion to vacate, on September 14, 2022, Dr. Rajeev Garapati (an orthopedic

_____

[5] This motion is neither in the record on appeal nor in the trial court's online docket.

surgeon) provided a letter stating that attorney Carbonara was under Dr. Garapati's care and that Carbonara was "able to go to trial and may need to come in a wheelchair due to recent surgery and recovery." The letter was reviewed during the status hearing on September 26, 2022, and the parties agreed to proceeding to trial on the previously scheduled trial date of October 24, 2022. Defendant included neither this letter nor a transcript of the status hearing in the record on appeal. The parties, however, do not dispute the court's statement in its posttrial motion, and the record on appeal includes the court's written order (of September 26, 2022) stating that trial would resume on October 24, 2022.

¶ 40 On October 17, 2022, defense counsel filed an emergency motion to postpone trial, stating that he was "literally just scheduled for emergency surgery tomorrow, on October 18, 2022." Counsel sought an extension of "no more than a couple of weeks." On October 24, 2022, the trial court noted that the matter came before the court to set the trial date, and that although plaintiff appeared by counsel, only defendant appeared and advised the court that defense counsel was in the hospital and unavailable. The court then set the trial date to December 7, 2022.

¶ 41 On November 23, 2022, defense counsel filed an "emergency motion to extend trial date."[6] Counsel stated that he had been diagnosed with a "paralyzed vocal cord, as a result of which, [he] has no voice whatsoever." Counsel stated that he was "amidst scheduling corrective surgery" and was advised that he would be able to communicate following surgery and "some minimal speech therapy." Counsel asked for a "minor adjustment" to the final trial date of "a matter of weeks." No affidavit or other supporting evidence was attached to this motion. On November 28, 2022, counsel filed a notice of motion indicating that he would appear via Zoom for a hearing on his motion on November 30, 2022.

---

[6] This motion was filed at 4:30 p.m. on the day before the Thanksgiving Day holiday.

¶ 42    On November 30, 2022, the trial court held a hearing on defendants' emergency motion. No report of proceedings (or acceptable substitute) for this hearing is in the record on appeal. Following the hearing, the court issued a written order denying the motion. The order stated that the matter was before the court "to be heard on Defendants' emergency motion to extend the trial date," all parties had appeared by counsel, and the court was "fully advised in the premises." The court re-confirmed the existing trial date of December 7, 2022.

¶ 43                              D. The Second Day of Trial

¶ 44    On December 7, 2022, the second day of trial began at which defendant presented his case in chief. This day of trial was fully transcribed in a report of proceedings. Prior to defendant calling the first witness to testify, the following colloquy took place:

> "MR. CARBONARA [defense counsel]: Please pardon me for not coming to my feet. I am in a wheelchair. I would like to renew at this time my motion to exclude witnesses.
>
> THE COURT: Okay. The—anyone who's here to be called as witness in this case, please step outside.
>
> MR. CARBONARA: And just a housekeeping matter, your Honor?
>
> THE COURT: Yes.
>
> MR. CARBONARA: Obviously I am using an amplifier to assist my voice.
>
> THE COURT: You are using that now?
>
> MR. CARBONARA: I am.
>
> THE COURT: Okay.

MR. CARBONARA:  So sometimes it peaks back and we get a shrill noise.  I'm going to try to keep that to a minimum.

THE COURT:  All right.  That's fine.

MR. CARBONARA:  I apologize in advance.  It's the best I can do with my vocal cord situation.

THE COURT: That will not be a problem, Mr. Carbonara."

Defense counsel then orally moved for a directed verdict, which the court denied.

¶ 45    Prior to eliciting defendant's testimony, the court allowed counsel's request to have his daughter assist him to present exhibits to witnesses and the court.  Defendant was then called to testify.[7]  Defendant reiterated that he is the sole managing member of Holdings, and then there was a lengthy discussion of his background.  Defendant stated in particular that he owns real estate brokerages that service foreclosed properties for banks.  He noted that, over the previous 25 years, his businesses have done more than 18,000 closings and more than $2 billion in "business."

¶ 46    Defense counsel asked defendant about a conversation with Kazmierczak regarding an unrelated Highland Park property transaction.  Plaintiff's counsel objected on the basis of an improper foundation.  The court responded, "Yeah.  Again, I just remind you, we are really getting deep in the woods here and it's too bad you didn't really prepare your examination well enough for this even though you had many months."  The court then reminded defense counsel that this was the last day of trial and to move on to the next question.

¶ 47    When defendant was asked to provide "some idea of the gross revenues that go through your various rehab and real estate corporations in any given year," defendant responded, "Millions of dollars."  The following colloquy then took place:

---

[7]   The direct examination of this witness spanned more than 80 pages of the report of proceedings.

"MR. KAHN [plaintiff's attorney]: Objection, your Honor. There has been discovery issued with regard to this failure to provide financial documents, representations to the Court.

This gets into the 237 notice, the tax returns, the production request we requested and the required proof for statements and such to show that he always had the money to pay it.

If you remember, I know it was six months ago, when he testified that he could have pulled from other accounts, and now we are getting into that again—

MR. CARBONARA [defendants' attorney]: Objection. That mischaracterizes—

THE COURT: First of all, he's making an objection. Let him complete it. Don't interrupt him.

For someone whose got difficulty talking, I'd think you would try to avoid interrupting someone else who's speaking.

He's interposing an objection. That's his right to do. Let him complete his objection.

Although, I will say you are now getting into a speaking objection which is not permitted.

MR. KAHN: Understood.

So, one, no documents such that are being—

THE COURT: All right. Well, okay—I'm going to overrule the objection on the grounds that these are all matters—if you think he's not being truthful, these are all matters you can pick up on your

16

cross examination of this witness which you will have an opportunity to do after his direct examination.

Fair enough?

MR. KAHN: Yes, I suppose. I still don't have the documents to be able to necessarily contradict—

THE COURT: Who cares? He's under oath. He's under oath. He's telling—he's being asked questions. He's bound to tell the truth and he's testifying.

And he just testified today under oath that he's done business with every bank in the United States of America which—well, I don't know what to say.

But—so he said now—the question was regarding his gross revenues, he's had gross revenues in the millions."

The court then directed defense counsel to ask his next question.

¶ 48 Defendant stated that his attorney, Bill Ralph, represented him "in every business endeavor" involved with Kantor "without exception." Defense counsel asked, "Did *** John Kantor ever represent you for the instant circumstances," and defendant responded, "Never."

¶ 49 With respect to the note at issue, defendant said that Kantor called him in April 2019 regarding an investor who wanted to invest $70,000 in defendant's business. Defendant stated that Kantor sent him a proposal in which defendant would receive $70,000 and then repay that amount and $20,000 in interest one week later. Defendant testified that he refused this proposal. Defendant did not involve his then-existing attorney, Bill Ralph. Defendant explained that this was because he believed that Kantor was acting as his attorney in this matter.

17

¶ 50    Defendant stated that he also rejected the subsequent note sent to him because he would be personally liable, and he further objected to the late charges and attorney fees. Defendant stated that the note he signed was the "ultimate deal they agreed to." Defendant added that this required the payment of $77,000 within one year. Defendant denied there were any discussions that the note would have to be repaid within one week. Defendant further stated that he had offered on numerous occasions to repay plaintiff.

¶ 51    On cross-examination, defendant admitted that he owed plaintiff $77,000 but had not paid any of that amount as of the trial date. Defendant agreed that he had dealt with notes before "over the past 20 some years" and that he had experience with "real estate and loans and those kinds of transactions." Defendant confirmed that the $70,000 loan funds he received went into the bank account of Holdings. Defendant further admitted that "from the day [Holdings] received that money," both he and Holdings had the ability to pay plaintiff the $77,000. Defendant reiterated that he was both the sole member and also the managing member of Holdings.

¶ 52    Plaintiff's counsel then asked defendant whether the "gross revenues in the millions" he had referred to on direct examination related to those of Holdings. Defendant initially agreed he was referring to Holdings but then stated that he could not remember. When asked what period of time he had been referring to, defendant said, "Probably for the past decade, two decades."

¶ 53    In response to plaintiff's counsel's question, defendant agreed that Holdings filed income tax returns for 2019 and 2020 and added that, for 2021, they filed "extensions." Plaintiff's counsel then asked whether he had brought the Holdings income tax returns for 2019 and 2020, but defendant said he did not. Plaintiff's counsel then informed the trial court that he had issued a "237 notice to produce" those records and asked that they be produced. Plaintiff's counsel noted that he had filed a motion for sanctions against defendants regarding discovery violations, and that "[t]his would be another one." Plaintiff's counsel stated that he would not be able to cross-examine

18

properly based upon defendant's testimony concerning "the ability to pay this money and all the other testimony with regard to his finances *** without that information."   The following exchanges then occurred:

> "MR. KAHN [plaintiff's attorney]:  There has already been a motion that's pending before your Honor for sanctions with regard to discovery violations.  This would be another one.
>
> * * *
>
> And we are here six months after the first day of trial and he testified that *** [Holdings] did file—
>
> Your Honor, he's—
>
> THE COURT:  Try to ignore him.
>
> Could you please stay still?
>
> [DEFENDANT]:  Okay.
>
> THE COURT:  Okay.  The punishment for not acting properly in court is contempt of court.  That means you walk directly to the holding cell in this build[ing].
>
> All right? Are we understood?
>
> THE WITNESS:  Yes."

The court then admonished defendant to stay still and silent while plaintiff's counsel made his record.  The court then asked plaintiff's counsel to continue.

¶ 54    The trial court indicated that, as a sanction for the discovery violation, plaintiff's counsel would be entitled to an "adverse inference," specifically, that defendant "was not in good financial standing."  The court explained that it is "easy to lie" and "to come in and say whatever you want

19

to say," but "if you are not willing to back it up with reasonable financial or business documentation, then *** it's grounds for a party asking for an adverse inference."

¶ 55    Defense counsel then asked the trial court to be heard, which the court allowed. Counsel replied, "Well, you've already ruled, so that's moot." Counsel then asked that defendant speak directly as to the status of his tax returns. In response, the court told counsel that he could elicit this information on redirect examination. The following exchanges then took place:

> "MR. CARBONARA:  Your Honor, if you don't mind, this was not part of our defense. As a matter of fact, when the question of the 237—
>
> THE COURT:  Well, you know, I'll leave that to your closing argument how you want to put it into your case.
>
> ***
>
> MR. CARBONARA:  But you—
>
> THE COURT:  You can put that in any way you want. I was offering you an opportunity to essentially argue a motion to reconsider the sanction that I have imposed.
>
> MR. CARBONARA:  That's exactly what I'm trying to do.
>
> What else would I be heard on? You've already ruled. You've already imposed the sanction. So anything I have to say must come in the context of a reconsideration.
>
> Am I wrong?
>
> THE COURT:  Well, I just said I'm inviting you to make your argument for reconsideration.
>
> What's your argument?"

In response, defense counsel said that his argument was that defendant had not been heard as to the "circumstances of his tax filings."

¶ 56    When the trial court then asked defense counsel for an offer of proof as to defendant's testimony, counsel directly asked the witness for same.  The court then explained to counsel that counsel should simply explain what the testimony would be.  Counsel, however, indicated that it wanted defendant to do so, and the court allowed the question.  Defendant then stated that his accountant, who "had all my records," had died, so his new accountant filed extensions.  In response to a question from the court, defendant confirmed that they filed extensions but not tax returns for 2019 or 2020.  The following exchanges then occurred.

> "THE COURT:  Okay.  So where are your—where is your other business documentation that was requested in the Rule 237 [notice to produce] to support your claim that you had so much money in 2019?
>
> MR. CARBONARA:  Your Honor, if I may?
>
> THE COURT:  Okay.  You know, you're—I've heard your motion to reconsider, it's—
>
> MR. CARBONARA:  Are you terminating my offer of proof, your Honor?
>
> THE COURT:  Well, I mean he stated he has these extensions, and we don't have those either.
>
> MR. CARBONARA:  I wasn't asked for extensions.  I was asked for tax returns.  And not to mention Judge Mulroy's ruling—
>
> THE COURT:  I'm sorry, I didn't hear what you said.
>
> MR. CARBONARA:  I was asked for tax returns—

21

THE COURT: No, that was a year ago. Okay? A year has passed since that happened. And so if he's got extensions for filings, he could have filed—

MR. CARBONARA: But the—

THE COURT: Let me finish. Let me finish. Because I don't mind—I've got to take a minute here.

Anything could have happened between a year ago and today regarding his tax status. And if you are coming here with absolutely nothing reflecting what he's done with his—pursuant to his obligation to file returns, I don't have copies of requests for extensions for filing, I don't have anything that's been filed by [*sic*] the IRS.

It was requested of you in the 237 notice and you've objected to it on baseless grounds. I've overruled your objections. You don't have it with you.

And so my ruling on the motion for failure to comply with the Rule 237 *** notice *** stands.

MR. CARBONARA: I object—

THE COURT: You know—do you take me for a fool, counsel? Do you take me for a fool?

MR. CARBONARA: No, sir.

THE COURT: That you can come in and have this individual who's a sole business proprietor, you know, an individual businessman, has his own LLC, is a hundred percent owned by him

22

and then he can come in and say anything he wants and you have no financial documentation to back it up?

Do you take me for a fool?

MR. CARBONARA: Judge, two years of his records are in evidence. Two years of his bank records are in evidence.

THE COURT: Yeah, and I don't think that helps you. So my ruling stands."

The court then asked plaintiff's counsel to ask his next question.

¶ 57 Defendant then confirmed that, in his prior testimony, he stated that he had not repaid the $77,000 when required on the altered note that he had signed. On redirect examination, defendant explained that he did not pay anything because, "They wouldn't take the amount, the [$]77,000. They were asking like for a million dollars." On recross-examination, defendant conceded that, had he paid the $77,000 owed under the note by April 11, 2019, there would not have been any potential damages, attorney fees, or additional interest.

¶ 58 Defense counsel then called Kantor to testify. Kantor reiterated that he had known defendant for 20 to 25 years. Kantor stated that he had never represented defendant and that he has not been involved in any transaction with defendant since the transaction with plaintiff. In response to counsel's question, Kantor said that defendant was "short of money" when defendant borrowed the money from plaintiff. Kantor said that he never asked defendant to provide funding for him. Kantor further denied ever asking defendant for a loan on the Highland Park property, but one of his clients did want a loan on that property from defendant.

¶ 59 Kantor further stated that, with respect to the $70,000 loan, he had initially sent a note providing that the principal amount and $20,000 in interest would be due in one week. Kantor explained that this was the amount he had negotiated on behalf of his client. During this

23

examination, defense counsel questioned whether the interest rate was "legal." In response to a question from the trial court, however, defense counsel confirmed that he was not accusing plaintiff of "a violation of usuary [*sic*] law."

¶ 60 According to Kantor, upon further negotiation, defendant subsequently agreed to pay $7,000 per week on the same principal amount. Kantor added that he never charged plaintiff attorney fees for this transaction. Kantor identified the unsigned note as the note he sent to defendant. The unsigned note was also the note that defendant said he had signed. In response to counsel's question, Kantor could not recall whether he had sent the note to defendant as a "PDF or Word document." Kantor explained that, after defendant had signed the note, Kantor called plaintiff, and plaintiff wired the funds to Holdings. Kantor told defendant to send or e-mail a copy of the note, but defendant did not do so. Kantor then suggested meeting defendant at 4 p.m. but the "schedules didn't work out," so they agreed to meet at noon the following day at defendant's restaurant in Rogers Park. Kantor received the altered note (that defendant had signed) at that time.

¶ 61 During this direct examination, defense counsel had asked whether there was "anything unusual about [defendant's] demeanor at that time." The following colloquy then took place:

"THE COURT: I'm sorry, what time? What?

MR. CARBONARA [defense counsel]: At the restaurant meeting.

THE COURT: Well, you interrupted your own examination on it.

MR. CARBONARA: Sure.

THE COURT: So they greeted each other at the restaurant, so pick up from there.

> MR. CARBONARA: Okay.
>
> THE COURT: Pick up from there. You are out of time.
>
> And, you know, forgive me, but you are not such the great artist in the courtroom to get him to trend his testimony in a fashion that's pretty unfavorable ***.
>
> So get to the next question."

Defense counsel subsequently asked about the events that transpired after receiving the note.

¶ 62    Later the same day, Kantor opened the envelope containing the note defendant had given him at the restaurant. Kantor then called defendant and told defendant that "the note is not the same thing that he told me he signed." Kantor added that defendant "hung up on me." Immediately afterwards, Kantor sent a text message to defendant with the wire instruction because Kantor believed that, since defendant was supposed to pay plaintiff back "in a couple weeks," defendant's alterations would not have any impact if defendant had paid plaintiff "on time."

¶ 63    Kantor noticed that, although it was the same form document that he had e-mailed to defendant, defendant had deleted "all the attorney's fees, late fees, changed the term to be interest for one week instead of forever until he pays it off." Kantor further observed, "That's never a document I drafted in my life."

¶ 64    Kantor then denied waiting "three months" before acting to enforce the terms of the note. Kantor said that he e-mailed and texted "wiring instructions" to defendant, and he also contacted defendant via text message or telephone "everyday almost prior to those three months." Kantor further stated that he sent defendant a written demand prior to filing the instant lawsuit.

¶ 65    Kantor agreed that he had contacted defendant's attorney (Bill Ralph) seeking construction financing for the Highland Park property on behalf of his client, Kazmierczak. Kantor believed that defendant had agreed to provide the financing, and the closing had been scheduled for August

25

2018. Kantor, however, stated that he did not know whether there was any "writing" between defendant and Kazmierczak, and Kantor had never seen any document reflecting Holdings' agreement to provide financing for the Highland Park property. Kantor, however, stated that Fidelity National prepared the closing documents. Kantor then explained that Fidelity National listed Holdings as the lender on the closing documents because defendant stated that he would provide the loan and gave Kantor the "LLC information to put on the note and the mortgage and such." Kantor noted, however, that defendant "never sent the wire," so the closing did not take place. Plaintiff's counsel objected during this testimony on the basis of relevance, and the trial court admonished defense counsel that he was "really taking too much time on this" and asked him to proceed to his next question.

¶ 66   Kantor said that he went twice to defendant's office seeking funding for the Highland Park property and that he did not recall how many times he called defendant regarding this financing. At one point during this examination, defense counsel shifted from asking Kantor about the meeting at the restaurant to the unrelated transaction in Highland Park. The court noted that, based upon Kantor's responses, counsel was "not getting anywhere with that." The court then observed, "So we're back at the restaurant," and then asked whether defense counsel had finished asking about the events at defendant's restaurant. Defense counsel then stated, "I like skipping around in cross[-]examination." The trial court responded, "All right. It's making this very inefficient and not easy for me, which means not easy for your case. So let's move it along. Next question." Kantor later denied ever staying for three hours at defendant's office regarding the Highland Park financing but said he had waited for defendant "quite a few times to get [plaintiff's] money back."

¶ 67   The defense then rested, and plaintiff's counsel recalled Kantor to testify in rebuttal. Kantor stated that the closing for the Highland Park property was scheduled based upon communications with both defendant and defendant's attorney. Kantor confirmed that he did not

have any ownership interest in the Highland Park property or the land trust associated with it, nor did Kantor make any such representation to either defendant or defendant's attorney. Regarding the note at issue, Kantor further denied that he told defendant he was acting as defendant's attorney. Kantor added, "I've never represented [defendant] in the 25 or so years that I am associated with him." Kantor also agreed that, regarding plaintiff's loan, Kantor had communicated that defendant would be personally liable on the loan. Kantor stated that he would be surprised to know that Holdings showed a $400,000 loss on its 2018 tax return. Kantor conceded, however, that he never saw the financial statements of either Holdings or defendant. Finally, Kantor did not recall ever including any wiring instructions on the note he had prepared and sent to defendant.

¶ 68    On cross-examination, Kantor stated that his $23,000 in attorney fees related to the Highland Park property have not been paid by Kazmierczak because Kantor has not sent the bill. Kantor explained that he was waiting for the property to close before sending his bill and agreed that that property has remained vacant for the previous six years.

¶ 69    Kazmierczak testified in rebuttal that defendant called him seeking a $70,000 short-term loan. Kazmierczak said that he did not have that amount of money but offered to contact someone to see if they could help defendant. Kazmierczak then contacted Kantor. The trial court noted to plaintiff's counsel that this testimony was already in evidence from the first day of trial. The following colloquy then took place:

> "MR. KAHN [plaintiff's counsel]:  Okay. I was a little unclear with that because [defendant's] testimony was that John Kantor—
>
> THE COURT:  Well, we don't care what his testimony is. If he's already testified to the contrary or differently, that's his testimony."

Counsel then informed the court that he had no further questions.

¶ 70   The court initially excused Kazmierczak, but defense counsel asked whether he would be able to question Kazmierczak.  The court stated, "Yeah, that's right.  You do have a chance to ask. I don't know why you would, but—."  On cross-examination, Kazmierczak agreed that he owned the Highland Park property, denied owing defendant $750,000 from a "failed business deal in Florida," and denied telling defendant "they made me do this" in the hallway outside of the courtroom after the first day of trial.

¶ 71   Plaintiff then rested his case in rebuttal, and the cause proceeded to closing arguments. Plaintiff's counsel argued in part that defendant admitted multiple times that he owes "at least $77,000" to plaintiff.  In addition, counsel argued that section C of the Uniform Commercial Code (UCC) states that a person taking an altered note for value in good faith and without notice of the alteration can enforce the rights with respect to the instrument according to its original terms. Plaintiff's counsel then stated that this was the case here based upon the original terms of the note Kantor e-mailed to defendant and agreed to based upon Kantor's testimony (who plaintiff's counsel pointed out was "an officer of the court").  Plaintiff's counsel said that the text messages and facts indicate that the note should be enforced by its original terms.  Plaintiff's counsel then commented that, although defendant might argue that it is "crazy" to owe over one million dollars on $70,000, plaintiff's counsel stated that "we wouldn't be here" if defendant had merely "paid the 70,000 plus the 7,000 [in interest] after the one week."  Plaintiff's counsel said that the total amount owed based upon the original terms of the note was $1,748,250.

¶ 72   With respect to the fraud count, plaintiff's counsel argued that the evidence showed that defendant agreed to the terms of the note and assured Kantor that defendant had signed the note to induce plaintiff's counsel to wire $70,000 to defendant.  Regarding whether defendant knew or believed his statement was false, plaintiff's counsel said, "[Defendant] knew he wasn't agreeing

28

to those terms *** [b]ecause he still hasn't paid any of the money." According to plaintiff's counsel, defendant thus never intended to be bound by the terms of the note, including the altered note that defendant had signed.

¶ 73 Defense counsel argued in substance that Kantor was not credible because Kantor repeatedly asked defendant for the financing for the Highland Park property and felt "stung" by defendant. Counsel further stated it is a "farce" that defendant would agree to pay an "outrageous" amount as claimed, and counsel added that defendant was ready to pay plaintiff.

¶ 74 Following closing arguments, the trial court issued its findings on the record. The court found that Kantor e-mailed the note to defendant, defendant responded by text message to Kantor that the proposal was "okay," and defendant needed the money wired by 3 p.m. that day. According to the court, defendants gave sufficient consent to plaintiff's offer and accepted it. There was consideration, expressed consent, and intent to sign the original (unsigned) note that plaintiff's counsel sent to defendant. The court then found that the note was fully enforceable on its terms. The court added, "Defendant's denials *** are neither credible nor supported by any persuasive evidence." The court concluded that defendants breached the agreement and are jointly and severally liable on the note. The court did not discuss the UCC or any case interpreting it.

¶ 75 The court further found that, on April 4, 2019, (1) defendant agreed to the terms of the note that Kantor had e-mailed; but (2) defendant's statement was "a misrepresentation of fact, a false statement"; and (3) plaintiff loaned $70,000 to defendant in reliance on that statement. The court added that defendant's statement to Kantor that defendant had signed the note Kantor had e-mailed was also a false statement, upon which plaintiff relied to his detriment as well. The court noted that plaintiff's reliance upon those statements was justifiable. The court characterized defendant's statements as "part of a fraudulent scheme to entice *** plaintiff, Kantor's principal, to transfer the money to [the] account [of Holdings] without any intention of complying with the April 4th,

2019 note terms." The court further characterized defendant's testimony "intended to contradict these facts" as not credible. The court then concluded by finding defendants liable on the claim of fraudulent misrepresentation in count II. The court awarded damages of $1,748,250 but noted that there would be no double recovery. Finally, the court stated that counts III and IV were moot.

¶ 76 The court's written order (dated December 7, 2022) reflected judgment in favor of plaintiff and against defendants on counts I (alleging breach of contract) and II (alleging fraud) in the amount of $1,748,250, comprising principal, interest, and late fees. The court further awarded plaintiff his attorney fees and allowed him leave to file a petition for attorney fees and costs within 28 days. Finally, the court found that counts III and IV (pleaded in the alternative) were moot.

¶ 77                                    E. Posttrial Proceedings

¶ 78 On January 6, 2023, defendants filed a motion to vacate judgment pursuant to section 2-1203 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1203 (West 2022)). Defendants argued that (1) plaintiff did not meet his burden of proof and the evidence did not support the trial court's findings, (2) the court erroneously denied defense counsel's emergency motion for a continuance, and (3) the damages award was unconscionable. Defendants asked the court to reconsider and vacate its judgment order, "reset the pre-trial and trial in this case," and for any other relief the court deemed just and equitable.

¶ 79 On April 24, 2023, the trial court issued a 19-page opinion and order denying defendants' motion. First, the court noted that the trial transcripts indicated defense counsel (Carbonara) was "fully capable of speaking throughout the second and last day of trial," with all of his examination questions, oral motions, and arguments fully transcribed. The transcript further revealed that both the court and plaintiff's counsel could hear and understand everything defense counsel stated. The court further recalled that counsel's motion to extend the second trial day did not comply with Rule 231, justifying denial on those grounds alone.

30

¶ 80    Next, the court rejected defendants' claim that plaintiff failed to meet his burden of proof. The court recalled that the evidence "amply" supported the court's judgment, and that case law provides that a defendant may be bound by the terms of a note based upon his acts and conduct even if the defendant has not signed the note.

¶ 81    Finally, the court rejected defendants' claim that the award was unconscionable. The court noted that, under controlling precedent, unconscionability is an affirmative defense that must be pleaded and if not, it is forfeited. The court stated that defendants never raised the defense at trial and there was no evidence to support it. In addition, the court recalled that prior appellate decisions have held that "[s]ophisticated businessmen, of the type [defendant] has insisted he is," are not afforded equitable relief from contractual terms that ordinary consumers may avoid under certain circumstances. The court thus denied defendants' motion to vacate.

¶ 82    On May 23, 2023, defendant filed a notice of appeal (appeal number 1-23-0936) challenging the trial court's order of December 7, 2022. On July 28, 2023, defendant filed a notice of appeal (appeal number 1-23-1364) challenging the court's orders of December 7, 2022, April 24, 2023, and July 11, 2023.[8] This court consolidated the appeals on August 28, 2023.

¶ 83                                    II. ANALYSIS

¶ 84    On appeal, defendants list 12 issues in their brief, which do not seem to correspond to the specific individual arguments on appeal. Following our reading of the brief, we can distill the dozen issues into the following four claims: (1) they are entitled to JNOV on count I (alleging breach of contract) and count II (alleging fraud); (2) they are entitled to a new trial on counts I and II because the trial court's factual findings were against the manifest weight of the evidence; (3) in

---

[8] The July 2023 order granted plaintiff's amended petition for attorney fees, which is not at issue in this appeal.

the alternative, they are entitled to a new trial or a reduction on damages; and (4) also in the alternative, the court's conduct of the trial entitles them to a new trial.

¶ 85                                A. Defendants' Brief

¶ 86    Before considering the merits of this appeal, we must briefly discuss the quality of defendants' briefs filed with this court. First, defendants' statement of facts is replete with attacks on the conduct of the trial court, in violation of Supreme Court Rule 341(h)(6). See Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020) (requiring the statement of facts in the appellant's brief to be stated "accurately and fairly without argument or comment"). Defendants' statement of facts seems to abruptly end before the rebuttal cross-examination of Kazmierczak, and it also omits any discussion of closing arguments, the court's findings (which defendants challenge), and any post-trial motions (which determines in part whether an issue is preserved). This also violates Rule 341, which requires that a statement of facts contain "the facts necessary to an understanding of the case." See *id.*; *Trapp v. City of Burbank Firefighters' Pension Fund*, 2024 IL App (1st) 231311, ¶ 14 (observing that Rule 341 is not "a license to cherry-pick").

¶ 87    Supreme court rules are not mere suggestions; they are rules that must be followed. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57. "Where an appellant's brief fails to comply with supreme court rules, this court has the inherent authority to dismiss the appeal." *Epstein v. Galuska*, 362 Ill. App. 3d 36, 42 (2005). We recognize, however, that striking a brief for failure to comply with supreme court rules is a harsh sanction. *In re Detention of Powell*, 217 Ill. 2d 123, 132 (2005). Although this brief has complicated and delayed our review, it does not completely frustrate it, so we will consider the merits of the appeal.

¶ 88                    B. Defendants' Entitlement to Judgment *n.o.v.*

¶ 89    Defendants assert that they are entitled to judgment notwithstanding the verdict (judgment *n.o.v.* or JNOV) on counts I and II. Defendants, however, did not file any such motion in the trial

court; instead, their then-counsel filed a motion entitled, "motion to vacate judgment," referencing the appropriate statutory citation (735 ILCS 5/2-1203 (West 2020)). Motions for JNOV are appropriate in jury trials, not in bench trials, as here. Compare 735 ILCS 5/2-1202 (West 2020) (entitled "Reserved ruling on motion for directed verdict—Post-trial motions in jury cases") with 735 ILCS 5/2-1203 (West 2020) (entitled "Motions after judgment in non-jury cases"). Defendants, nonetheless, raise substantially the same issue in their brief as they did in their 2-1203 motion: sufficiency of the evidence, *i.e.*, that plaintiff failed to meet his burden. Accordingly, we will evaluate this claim of error under the framework of an appeal from a section 2-1203 motion.

¶ 90      The purpose of a motion to vacate pursuant to section 2-1203 is to alert the trial court to errors it made and to afford it an opportunity to correct them. *Wolkowitz v. Jamison*, 2024 IL App (1st) 230455, ¶ 42. The intended purpose of a section 2-1203 motion is to bring to the court's attention: (1) newly discovered evidence, (2) changes in the law, or (3) errors in the court's previous application of existing law. *Id.* We review a court's decision on a section 2-1203 motion to vacate for an abuse of discretion. *Id.* ¶ 34. A court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the court's view. *Doe v. J.P.J.*, 2024 IL App (1st) 240157, ¶ 27 (citing *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009); *Maniscalco v. Porte Brown, LLC*, 2018 IL App (1st) 180716, ¶ 29). In the context of a denial of a section 2-1203 motion, whether the court has abused its discretion also turns on whether the denial violates the moving party's right to fundamental justice and manifests an improper application of discretion. *Mryszuk v. Hoyos*, 228 Ill. App. 3d 860, 863 (1992).

¶ 91                              1. *Breach of Contract (Count I)*

¶ 92      Defendants first argue that they are entitled to judgment *n.o.v.* on the breach of contract count because they cannot be held liable "on any purported instrument if they did not sign it," and thus, they cannot be held liable on the original note. Defendants then engage in a lengthy

33

discussion of various provisions of the UCC (810 ILCS 5/1-101 *et seq.* (West 2022)). We note, however, that defendants' trial counsel never argued this precise issue at trial. Defense counsel's theory at trial essentially focused on general principles of contract formation and whether defendant assented to the terms of the note Kantor had drafted and e-mailed to defendant. This argument was insufficiently presented to the trial court and is thus forfeited. *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996) ("It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal."); *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 63.

¶ 93    Defendants, however, further argue that they are entitled to judgment in their favor because the parties contemplated a written, formally executed agreement, which was absent in this case. Defendants also argue that there was no "meeting of the minds" as to the contract's existence or its terms, including the amount of interest to be paid on the principal.

¶ 94    The essential elements of a breach of contract are as follows: (i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of the contract by the defendant, and (iv) resultant injury to the plaintiff. *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 27. The terms of an agreement, if unambiguous, should generally be enforced as they appear, and those terms will control the rights of the parties. *Id.* (citing *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 479 (1998)).

¶ 95    Defendants' argument concerns the first element, the existence of a valid and enforceable contract. It has long been held that, in Illinois, "the basic ingredients" of a contract are an offer, an acceptance, and consideration. *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 151 (2006) (citing *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 329 (1977)). It is a deeply rooted rule that one of the essential elements for formation of a contract is "a manifestation of agreement or

mutual assent by the parties to the terms thereof." *Allen v. Amber Manor Apartments Partnership*, 95 Ill. App. 3d 541, 549 (1981).

¶ 96    As a general rule, one of the acts forming part of the execution of a written contract is its signing. *Hedlund & Hanley, LLC v. Board of Trustees of Community College District No. 508*, 376 Ill. App. 3d 200, 206 (2007) (citing *Lynge v. Kunstmann*, 94 Ill. App. 3d 689, 694 (1981)). Nonetheless, an unsigned writing can constitute a binding contract based upon the intent of the parties. *Id.* " 'The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, [such] as * * * by acts or conduct of the parties.' " (Alterations in original.) *Id.* In addition, this court has long held that, where one party signs a contract and informs the other party that he has done so, a binding written contract may be formed "regardless of whether or not the contract is actually delivered." *M.J. Oldenstedt Plumbing Co., Inc. v. K mart Corp.*, 257 Ill. App. 3d 759, 765 (1994); see also 17 C.J.S. *Contracts* § 67 (Dec. 2024 Supp.) ("Acceptance of a contract may be accomplished by words or by conduct, and may be implied from the acts and circumstances of the parties."); 12 Ill. L. and Prac. *Contracts* § 26 (Jan. 2025 Supp.) ("The acceptance of an offer, although the offer is in writing, need not be in writing, but may be made orally or inferred from conduct, unless a written acceptance is required by the offer.").

¶ 97    Whether parties have mutually assented to the terms of a contract is a question of fact. *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 20. Notably, whether mutual assent or an intent to accept exists is determined by an objective standard. *Id.* "In other words, it is not necessary that the parties share the same subjective understanding as to the contract's terms, as it suffices if their conduct objectively indicates an agreement to the terms of the purported contract." *Id.* (citing *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 313-14 (1987)).

¶ 98    In this case, the trial court properly denied defendants' motion to vacate the judgment on count I.  The evidence at trial established that defendant sought a $70,000 loan, which would allow him to complete a real estate investment.  Plaintiff's attorney, Kantor, negotiated with defendant on behalf of plaintiff, culminating in a $70,000 loan from plaintiff to defendant for one week only (due no later than April 11, 2019) with $7,000 in interest per week and a $250 daily charge for overdue payments.  Kantor further testified that he sent the note to defendant with those terms.  According to Kantor, defendant agreed to those terms on the phone and informed Kantor that defendant had signed the note.  Defendant admitted that he responded "Ok" via text message regarding the one-week term of the loan but required that he receive the loan funds on or before 3 p.m. on April 4, 2019.  This evidence amply supports the trial court's conclusion that defendant's conduct—in particular, his statement to Kantor that he had signed the note that Kantor had negotiated on plaintiff's behalf and sent to defendant—constituted his assent to the terms of the unaltered note.  Accordingly, we cannot hold that the court's denial violated defendants' right to fundamental justice or manifested an improper application of discretion.  Nor was its denial arbitrary, fanciful, or unreasonable, or one where no reasonable person would adopt the court's view.  Therefore, the court did not abuse its discretion, and we reject defendants' claim on this point.  See *Mryszuk*, 228 Ill. App. 3d at 863; *Doe*, 2024 IL App (1st) 240157, ¶ 27.

¶ 99    In addition, we must further reject defendants' claim that "no reasonable factfinder" would believe that defendants would agree to a loan with "an unconscionable and ruinous 520% interest rate."  Here, there is overwhelming evidence in the record to support the court's findings, so vacating the judgment on Count I is unwarranted.  Defendants' argument is therefore meritless.

¶ 100  Finally, we reject defendants' assertion that they are entitled to judgment in their favor because "it would be unconscionable to enforce a 520% interest rate."  "Unconscionability is an affirmative defense, which must be raised by a proper pleading; otherwise, it is waived."  17B

36

C.J.S. *Contracts* § 907 (Dec. 2024 Supp.); see also *Chicago Title & Trust Co. v. Illinois Merchants' Trust Co.*, 329 Ill. 334, 345 (1928) ("The claim that the contract was unfair was an affirmative defense, and the burden of proving that defense rested on [defendants-]appellants."). Defendants here failed to raise unconscionability before the trial court and only belatedly raised it in their post-trial motion to vacate—in a bare paragraph devoid of legal authority or legal analysis. Accordingly, this claim is forfeited.

¶ 101    Moreover, this argument fails on the merits.  A borrower's claim of unconscionability, as here, typically seeks shelter under a claim of usury.  See *Sweeney v. Citicorp Person-to-Person Financial Center, Inc.*, 157 Ill. App. 3d 47, 55 (1987) ("The usury laws were intended to protect the unwary and needy debtor against the unconscionable money lender.").  As discussed below, it has long been held that "if a defendant who is sued on a usurious note fails or declines to claim the defense, the court then has the obligation to treat the interest as collectible in accordance with its terms, even though it may be at a usurious rate." *Cohn v. Receivables Finance Co.*, 123 Ill. App. 2d 224, 230 (1970).  Here, the trial court found that defendant (Olszewski) agreed to the one-week term of the note with 10% interest (*i.e.*, $7,000) owed each and every week, and at trial, defense counsel specifically *rejected* any possible defense based upon usury.  Under these circumstances, we may not rewrite the contract to defendants' current liking; to the contrary, the amount owed under the contract is collectible based upon the contract terms that the court found.  See *id.*  We therefore reject defendants' challenge to the court's findings on count I.

¶ 102                    2. *Common Law Fraud (Count II)*

¶ 103    Defendants also contend that they are entitled to judgment *n.o.v.* on count II, which alleged common law fraud.  Defendants argue that plaintiff failed to prove *any* of the elements of fraud. In particular, defendants argue that plaintiff (1) could not reasonably rely upon any oral statements regarding the terms of the contract because the parties contemplated a written contract, (2) did not

show a false or fraudulent statement of material fact, and (3) did not establish that he reasonably relied upon "whatever Kantor relayed" about defendant's statement. Finally, defendants further reiterate their earlier argument that no reasonable factfinder would agree to a loan with a purported "520% interest rate."

¶ 104 Plaintiff's common law fraud claim is grounded in the underlying tortious conduct of fraudulent misrepresentation. See *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286 (1980). To prevail on a claim of fraudulent misrepresentation, a plaintiff must establish the following elements: " '(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance.' " *Certain Underwriters at Lloyd's, London v. Abbott Laboratories*, 2014 IL App (1st) 132020, ¶ 47 (quoting *Doe v. Dilling,* 228 Ill. 2d 324, 342-43 (2008)). Claims of fraud must meet a higher standard of specificity and require specific allegations of facts from which "fraud is the necessary or probable inference." See *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 496-97 (1996). Put another way, a successful common law fraud complaint must allege, with specificity and particularity, "facts from which fraud is the necessary or probable inference, including what misrepresentations were made, when they were made, who made the misrepresentations and to whom they were made." *Id.* A promise to perform some future act, even if made with the intent to not perform that act, is not actionable fraud unless that false promise is "part of a fraudulent scheme." *People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 387-88 (1993); see also *Merrilees v. Merrilees*, 2013 IL App (1st) 121897, ¶ 41 (holding that "assurances as to future events are generally not considered misrepresentations of fact").

¶ 105 In this case, the evidence at trial established that defendant sought a $70,000 loan on short notice. Defendant repeatedly told Kantor that he needed the funds on or before 3 p.m. on

April 4, 2019. Kantor negotiated (on behalf of plaintiff) a $70,000 loan from plaintiff to defendants for one week only (due no later than April 11, 2019) with $7,000 in interest per week and a $250 daily charge for overdue payments. Defendant admitted responding "Ok" via text message regarding the one-week term of the loan but reiterated the deadline to receive the loan funds. Kantor sent the note to defendant with those terms, and after discussing the contents of the note with defendant by telephone, Kantor told defendant that defendant had to sign the note before the funds could be transferred. According to Kantor, defendant agreed to the terms on the phone and informed Kantor that defendant had signed the note. After providing the wire instructions during that call, defendant again affirmed that the loaned amount with interest would be repaid in a week.

¶ 106   After confirming the transfer of the $70,000 in funds, Kantor asked defendant for either a text message or e-mail with an image of the signed note; Kantor also offered to pick up the original signed note from defendant's office. Instead, defendant suggested they meet at defendant's restaurant at noon the next day (April 5, 2019), where defendant would give Kantor the signed note. At the restaurant, defendant gave Kantor an envelope that defendant said contained the signed note and immediately left. When Kantor opened the envelope and saw that the note defendant had signed was materially altered, he confronted defendant, but defendant hung up on Kantor without addressing Kantor's claim. Despite Kantor's multiple subsequent attempts to contact defendant and obtain repayment of the note, defendant never repaid the loan.

¶ 107   On these facts, defendant made a false statement of material fact when he told Kantor on the phone that he had signed the note that Kantor had drafted and had earlier agreed via text message to a loan term of only one week. In addition, defendant's knowledge or belief that the statement was false (the second element) is clearly inferred from his conduct in altering the note, surreptitiously leaving the note with Kantor, immediately leaving thereafter, and refusing to talk to Kantor on the phone when Kantor saw that his drafted note had been altered. Defendant's intent

to induce plaintiff to loan him the funds is similarly easily inferred based upon these assurances and defendant's text message response agreeing to the one-week term, establishing the third element. The fourth element, plaintiff acting in justifiable reliance upon the apparent truth of the statements, is also met. Plaintiff wired the funds to defendant in response to both defendant's insistence that the funds be transferred by 3 p.m. and also defendant's assurances (as relayed by his attorney, Kantor) that defendant agreed to the terms of the note and signed it. Finally, the last element (damage to plaintiff resulting from the reliance) was established based upon defendant's failure to repay the note, a fact that he freely conceded during trial. Vacatur of count II is therefore unwarranted, and the trial court did not err in denying the motion to vacate this count.

¶ 108 We reject defendants' arguments to the contrary. First, defendants baldly assert that plaintiff could not reasonably rely upon any oral statements regarding the terms of the contract because the parties contemplated a written contract. Defendants cite nothing in support of their assertion in violation of Rule 341 (Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Argument *** shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities *** relied on. *** Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). We have not found any authority holding that a written contract—in particular, a contract that (as here) lacks an integration or merger clause—controls whether a plaintiff can establish reasonable reliance in the common law fraud context. We thus reject this undeveloped argument.

¶ 109 Defendants further argue that plaintiff did not show a false or fraudulent statement of material fact because defendant only stated that he signed "a" note without specifying which particular note he signed. This argument borders on the frivolous. The evidence established that (1) defendant sent a text message stating "Ok" in direct response to Kantor's message emphasizing that the term of the loan would be for one week only; (2) defendant conceded this fact at trial; and

40

(3) Kantor testified that, after discussing the terms of the note with defendant, defendant agreed to the terms and assured Kantor that defendant had signed the note. On these facts, defendants' argument is untenable.

¶ 110 Defendants' additional argument on reasonable reliance (*i.e.*, that plaintiff did not establish reasonable reliance upon "whatever Kantor relayed" about defendant's statement) is meritless. Defendants cite a plethora of cases to support their claim that plaintiff unreasonably relied upon Kantor's oral statement instead of waiting and viewing the actual note. We have reviewed the cases and find them unpersuasive. The common thread running through all of those cases is that courts examine all relevant circumstances surrounding the alleged misrepresentation (including the opportunity a plaintiff had to investigate) to determine whether a plaintiff's reliance was reasonable. Here, plaintiff relied upon Kantor's statement that defendant—whom Kantor had known and dealt with before—had agreed to the note's terms and signed the note. Combined with defendant's urgent need for the funds, defendant's fraudulent assurances were reasonably relied upon by plaintiff under the circumstances of this case. Finally, defendants' argument that no reasonable factfinder would agree to a loan with a purported "520% interest rate" (which they made in their challenge to count I) is rejected for the same reasons we discussed above.

¶ 111                          C. The Trial Court's Findings

¶ 112 Defendants further contend that they are entitled to a new trial because the trial court's factual findings were against the manifest weight of the evidence. Defendants' claim on this point consists of a single paragraph that relies upon their arguments "set forth above," *i.e.*, for the same reasons argued in their erroneously titled JNOV claim. Defendants further assert that (as argued in support of their request for JNOV) the court's findings were against the manifest weight of the evidence, "even if, contrary to the evidence and arguments already presented above, [plaintiff] had offered evidence to establish each element of his causes of action for breach of contract and fraud."

Defendants then cite *Doyle v. White Metal Rolling & Stamping Corp.*, 249 Ill. App. 3d 370, 380 (1993), in support of their claim, but they provide no discussion of the case whatsoever. Setting aside considerations of forfeiture, defendants here seemed to have misread *Doyle*: in that case, the court *rejected* the defendants' challenge to a jury instruction on product liability and held that the plaintiff "offered evidence supporting its theory of recovery." *Id.*

¶ 113   In any event, we have already rejected defendants' claim that the trial court erred in denying the motion to vacate, *supra*, so we necessarily reject their demand for a new trial predicated on this same challenge to the court's findings. Defendants' contention of error on this point is therefore devoid of merit.

¶ 114                                    D. Damages

¶ 115   Defendants next claim that, in the alternative, they are entitled to either a reduction in the damages award against them or a new trial on damages. Specifically, defendants first argue that the trial court's calculation of contract damages was inconsistent with the terms of the contract. Defendants argue that the contract "by its own terms had to be interpreted consistent with the *** Interest Act, which is Illinois' usury statute [815 ILCS 205/0.01 *et seq.* (West 2022)]." Defendants thus conclude that plaintiff could not charge a higher interest rate than 9%, warranting a reduction. Defendants further argue that the court erred in calculating damages under the fraud count, claiming that plaintiff is only entitled to the sum of money lent plus statutory prejudgment interest "for the time plaintiff was deprived of possession." By defendants' calculation, this amounts to $70,000 plus 5% annual interest from April 11, 2019.

¶ 116   With respect to defendants' first argument, section 7 of the Interest Act states that the defense of usury is not allowed unless the person relying upon it either pleads that defense or files a written notice of intent to defend upon that basis. See 815 ILCS 205/7 (West 2022). In addition, the defense of usury is an affirmative defense that must be pleaded in the trial court; otherwise, it

is forfeited. See *Hibernian Banking Ass'n v. Davis*, 295 Ill. 537, 545 (1920); *Hall v. Montaleone*, 38 Ill. App. 3d 591, 592 (1976); see also *Commercial Mortgage & Finance Co. v. Life Savings of America*, 129 Ill. 2d 42, 45 (1989) (referring generally to the "affirmative defense of usury"). Here, not only did defendants fail to plead the defense, but also their trial counsel affirmatively told the court that he was *not* lodging any such defense.

¶ 117   Moreover, under the doctrine of invited error, "a party cannot complain of error which that party induced the court to make or to which that party consented." *In re Detention of Swope,* 213 Ill. 2d 210, 217 (2004). The rationale behind this doctrine is that "it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings." *Id.* In this case, the record reveals that defendants both failed to assert the affirmative defense of usury at the pleading stage and then *expressly disavowed* any such defense at trial. As a result, defendants may not now contend that the award constitutes improper usury. On this additional ground, defendants have forfeited this claim.

¶ 118   In their reply brief, they revise their argument. They claim that they "are not raising usury as an affirmative defense here nor are they suggesting [plaintiff] 'violated' the Interest Act"; instead, they assert that, since the note included a " 'savings clause' " (presumably, the "Loan Charges" section of both notes), it would "automatically reduce any excess interest rate." This argument is also meritless. The Loan Charges section did indeed state that, if any loan charges under the note exceeded permitted limits under any law, those loan charges would be reduced to the permitted limit. Although defendants claim they are abandoning any defense under the Interest Act (including the affirmative defense of usury), they do not explain what other specific statute would reduce the interest rate under the note. As already explained, Rule 341 requires that an appellant include in its argument "citation of the authorities *** relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). "In addition, it is well established that a reviewing court is not 'simply a

43

depository in which the appealing party may dump the burden of argument and research.' " *Batson v. Oak Tree, Ltd.*, 2013 IL App (1st) 123071, ¶ 41 (quoting *Pecora v. Szabo*, 109 Ill. App. 3d 824, 825-26 (1982)). For this reason alone, defendants have forfeited this argument.

¶ 119 Furthermore, defendants conclude that Olszewski individually would only have to pay a "maximum permitted" 9% annual interest. Despite defendants' disavowal of any usury-based defense, this interest rate coincides with the maximum non-usurious rate provided by statute. See, *e.g.*, *McGinley Partners, LLC v. Royalty Properties, LLC*, 2018 IL App (1st) 171317, ¶ 62 (observing that, "any time the interest rate exceeds 9% ***, such an interest rate would be found to be usurious"). An affirmative defense must be pleaded and proved. See, *e.g.*, *Rozny v. Marnul*, 43 Ill. 2d 54, 73 (1969); *Goldman v. Walco Tool & Engineering Co.*, 243 Ill. App. 3d 981, 989 (1993). In essence, defendants are arguing that this provision obviates the need to raise and prove the affirmative defense of usury, contrary to the century-old holding of our supreme court. See *Hibernian Banking Ass'n*, 295 Ill. at 545. Our reading of the Loan Charges provision indicates that an applicable law must be "interpreted" as placing a cap on the loan charges. Defendants cite no other law that would advance this claim. We thus reject it.

¶ 120 Defendants' reliance upon *Grove v. Chicago Title & Trust Co.*, 25 Ill. App. 2d 402 (1960), and *Poeta v. Sheridan Point Shopping Plaza Partnership*, 195 Ill. App. 3d 852 (1990), do not alter our holding. With respect to *Grove*, although the court held that an individual co-maker may assert the defense of usury even if the other co-maker is a corporation, the court first noted that the individual co-maker's delay in asserting that defense was due to the fact that "he relied on respondent's promise to vacate the judgment," which the respondent never did. *Grove*, 25 Ill. App. 2d at 409. In *Poeta*, the court stated, "The issue of damages was clearly before the trial court." *Poeta*, 195 Ill. App. 3d at 858. Here, by contrast, defendants' failure to assert the defense of usury was not based upon another party's deception; instead, it was their trial counsel's conscious

Nos. 1-23-0936, 1-23-1364 (cons.)

decision to refuse to rely upon that defense. In addition, defendants failed to plead the affirmative defense of usury and to directly challenge damages. In other words, the issue of damages in this case was clearly *not* before the court. Defendants' reliance upon *Grove* and *Poeta* is therefore unavailing.

¶ 121 Turning to defendants' second argument, namely, the damages calculation for the common law fraud count (count II), defendants assert that Illinois courts have "uniformly held that the measure of damages for a fraudulently induced loan is the sum of money lent plus statutory pre-judgment interest for the time that the plaintiff was deprived of possession." They have not so uniformly held. Defendants' reliance upon a federal bankruptcy case (*In re Collazo*, 613 B.R. 650, 667 (N.D. Ill. 2020)) and "cases cited [therein] dating back to 1886" for this claim is misplaced. Setting aside the fact that the decisions of lower federal courts do not control the decisions of Illinois courts (see, *e.g.*, *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 302 (2001); *Prodromos v. Everen Securities, Inc.*, 389 Ill. App. 3d 157, 175 (2009); *Vulpitta v. Walsh Construction Co.*, 2016 IL App (1st) 152203, ¶ 34), defendants have misquoted *Collazo*, which in fact stated as follows: "The Illinois Supreme Court long ago held, as the Illinois Appellate Court has more recently explained, that 'the measure of damages for a fraudulently induced loan was the sum of money lent plus interest for the time that plaintiff was deprived of possession.' " *Collazo*, 613 B.R. at 667 (quoting *Commercial National Bank of Peoria v. Federal Deposit Insurance Corp.*, 131 Ill. App. 3d 977, 984 (1985) (citing *Horne v. Walton*, 117 Ill. 130, 135 (1886))).

¶ 122 Moreover, although the federal district court in *Collazo* affirmed the bankruptcy court's decision to award only prejudgment interest and not contractual interest, it noted that the bankruptcy court found that the parties were not "in contractual privity": the plaintiffs had lent money to the defendant's LLC, purportedly based upon the defendant's (but not the LLC's) fraudulent statements. See *id.* at 668-70; see also *In re Collazo*, 12 B 44342, slip op. at 5 (Bankr.

45

N.D. Ill. July 1, 2019) ("Here, there is an agreement, but it is between the [plaintiffs] and [defendant's LLC], not between the [plaintiffs] and [defendant].").  Here, by contrast, defendants *were* in contractual privity with plaintiff.  As such, defendants' claim on this point is meritless.

¶ 123                                    E. The Trial Court's Conduct of the Trial

¶ 124   Finally, defendants alternatively contend that, should we decline to reverse the trial court's judgment in favor of plaintiff or grant either a reduction or a new trial on the issue of damages, they are nonetheless entitled to a new trial on the following additional grounds:  (1) the court erred in denying defense counsel's emergency motion for continuance (*i.e.*, to extend the trial date); (2) the court lacked impartiality and improperly advocated on behalf of plaintiff; and (3) the court erroneously rejected defendants' jury trial demand.

¶ 125                                    1. *The Motion for Continuance*

¶ 126   Defendants' first contention in the alternative is that the trial court improperly denied their emergency motion to extend the trial date.  Defendants state that trial counsel (attorney Carbonara) had explained to the court that he had been diagnosed with a "paralyzed vocal cord [*sic*]" resulting in him having "no voice whatsoever."  Defendants assert that the court denied this motion "without any reason other than [the court's] impatience with Carbonara's ongoing health issues." Defendants ask that we vacate the judgment and remand for a new trial.

¶ 127   Defendants, however, have failed to provide either a report of proceedings (or an acceptable substitute) for the hearing on their motion.  Illinois Supreme Court Rules 321 and 324 require an appellant to provide a complete record on appeal, including a certified copy of the report of proceedings.  See Ill. S. Ct. R. 321 (eff. Feb. 1, 1994); Ill. S. Ct. R. 324 (eff. July 1, 2017).  If a verbatim transcript is unavailable, the appellant may file an acceptable substitute, such as a bystander's report or an agreed statement of facts, as provided for in Rule 323.  See Ill. S. Ct. R. 323 (eff. July 1, 2017).  The burden of providing a sufficient record on appeal rests with the

appellant (here, defendants). *Maniscalco*, 2018 IL App (1st) 180716, ¶ 30 (citing *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 156 (2005); *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984)). In the absence of such a record, we must presume the trial court acted in conformity with the law and with a sufficient factual basis for its findings. *Foutch*, 99 Ill. 2d at 392. Furthermore, any doubts arising from an incomplete record will be resolved against the appellant. *Id.* This is particularly true "when the judgment order states that the court is fully advised in the premises." *Dell'Armi Builders, Inc. v. Johnston*, 172 Ill. App. 3d 144, 149 (1988). With these limitations in mind, we turn to the substance of defendants' claim.

¶ 128 A litigant has no absolute right to a continuance. *In re Marriage of Ward*, 282 Ill. App. 3d 423, 430 (1996). Section 2-1007 of the Code states in relevant part that the trial court has the discretion to grant additional time for "the doing of any act or the taking of any step or proceeding prior to judgment" on good cause shown. 735 ILCS 5/2-1007 (West 2022). It further provides that the "circumstances, terms and conditions under which continuances may be granted, the time and manner in which application therefor shall be made, and the effect thereof, shall be according to rules." *Id.* Supreme Court Rule 231(f) states in part that no motion to continue a cause that has been lodged after the cause has been reached for trial shall be heard "unless a sufficient excuse is shown for the delay." Ill. S. Ct. R. 231(f) (eff. Jan. 1, 1970).

¶ 129 "The party seeking a continuance must provide the court with *especially grave reasons* for a continuance once the case has reached the trial stage because of the potential inconvenience to the witnesses, the parties, and the court." (Emphasis added.) *Ward*, 282 Ill. App. 3d at 430-31. Sickness of the trial attorney might be sufficient grounds for continuance. *Id.* at 431. A motion for continuance based upon the illness of a party, however, must be supported by "competent medical testimony stating the nature of the illness and the reasons why that party is unable to attend or participate in the trial." *Id.*; see also *Schnell v. Rothbath*, 71 Ill. 83, 84 (1873) (affidavit

47

containing unsworn attending physician's "certificates" that attorney too ill to attend court "manifestly wholly insufficient for the purpose of procuring a continuance").

¶ 130   It is well established that a motion for a continuance not based upon statutory causes is within the sound discretion of the trial court, which we will not disturb absent evidence of a "manifest abuse of discretion or a palpable injustice." *In re Marriage of Pillot*, 145 Ill. App. 3d 293, 298 (1986) (citing *Benton v. Marr*, 364 Ill. 628 (1936); *Thomas v. Thomas*, 23 Ill. App. 3d 936 (1974); *Reecy v. Reecy*, 132 Ill. App. 2d 1024 (1971)).  As noted above, a court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the court's view.  *Doe*, 2024 IL App (1st) 240157, ¶ 27 (citing *Blum*, 235 Ill. 2d at 36; *Maniscalco*, 2018 IL App (1st) 180716, ¶ 29).

¶ 131   Here, the trial court neither manifestly abused its discretion nor committed a palpable injustice.  At the outset, the court's order (dated November 30, 2022) indicated that the matter came before it to be *heard* on defendants' motion and that it was "fully advised in the premises." Defendants' claim largely depends upon what transpired at the hearing on their emergency motion to extend the trial date.  Furthermore, without a transcript or acceptable substitute, we are unable to determine whether the court erred in denying their motion.  We must therefore presume the court acted in conformity with the law and with a sufficient factual basis for its findings.  See *Foutch*, 99 Ill. 2d at 392; *Illinois Founders Insurance Co. v. Williams*, 2015 IL App (1st) 122481, ¶ 56 ("We cannot divine the trial court's reasoning in denying defendant's motion and cannot determine whether that decision constituted an abuse of discretion."); see also *People v. Majer*, 131 Ill. App. 3d 80, 84 (1985) (holding that, when the record is incomplete, a reviewing court must indulge "every reasonable presumption" in favor of the judgment that is appealed, "including that the trial court ruled or acted correctly").  On this basis, we are compelled to affirm the court's judgment.

¶ 132   Moreover, even based upon the limited record before us, defendants' claim would fail. The trial court's order denying defendants' posttrial motion to vacate stated in part, "Attorney Carbonara [defendants' trial attorney] appeared at the Zoom hearing [on November 30, 2022] and, despite the motion's content, was able to speak clearly, albeit with noticeable hoarseness." Trial counsel's emergency motion (filed on November 23, 2022) claimed that he had "no voice whatsoever," but merely seven days later, the court observed that counsel could speak "clearly" but with hoarseness. Trial counsel's ability to speak clearly obviated any need to continue the trial, which had already been continued for a significant period of time. Finally, we note that counsel's motion lacked any affidavit or supporting evidence, contrary to over 150 years of precedent. See *Ward*, 282 Ill. App. 3d at 431; *Schnell*, 71 Ill. at 84.

¶ 133   We further note that, despite trial counsel's claim of a weakened ability to speak, his direct examination of defendant and Kantor spanned approximately 80 pages and 40 pages of the transcript, respectively. This seriously undermines defendants' assertion that trial counsel suffered from a medical impairment. The court's order denying defendants' motion to vacate further recounted that trial counsel was physically and intellectually capable of representing defendants.

¶ 134   Accordingly, we cannot hold that the court's denial of their motion was either a manifest abuse of discretion or a palpable injustice because its decision was neither arbitrary, fanciful, unreasonable, nor one that no reasonable person would adopt. *J.P.J.*, 2024 IL App (1st) 240157, ¶ 27. Defendants' claim of error on this point is therefore meritless.

¶ 135          2. *Whether the Trial Court Acted as an Advocate for Plaintiff*

¶ 136   Defendants also contend in the alternative that they are entitled to a new trial because the trial court exhibited "impermissible bias," depriving them of a fair and impartial trial. In particular, defendants argue that the court improperly acted as "an advocate for plaintiff," which defendants claim was a clear abuse of the court's discretion.

¶ 137   Setting aside whether defendants' have forfeited this claim for failing to raise it below, this contention of error is without merit.  A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice.  *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 31; *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002).  A trial judge's rulings alone are almost never a valid basis from which to claim judicial bias or partiality, including allegedly erroneous findings and rulings.  *Id.*  Instead, the party claiming prejudice must present evidence of prejudicial trial conduct and evidence of the judge's personal bias, which can stem from an extrajudicial source.  *Id.*

¶ 138   In addition, a trial court has wide discretion in conducting a trial.  *First National Bank of LaGrange v. Lowrey*, 375 Ill. App. 3d 181, 212 (2007).  In a jury trial, however, the court may not interject comments or opinions indicating its opinion on the credibility of a witness or the argument of counsel.  *Id.*  Nonetheless, to constitute reversible error, defendants must show that they were harmed by the remarks and that the remarks were prejudicial.  *Id.*

¶ 139   By contrast, in a bench trial, "the danger of prejudice stemming from a judge's questioning of a witness is decreased sharply."  *People v. Smith*, 299 Ill. App. 3d 1056, 1063 (1998).  Thus, in a nonjury trial, prejudice is shown when "the tenor of the court's questioning indicates the court has prejudged the outcome before hearing all of the evidence."  *Id.*

¶ 140   "The fact that a judge displayed irritation or displeasure with the defense 'is not necessarily evidence of judicial bias against defendant.' "  *People v. Moore*, 2023 IL App (1st) 211421, ¶ 124 (quoting *People v. Jackson*, 205 Ill. 2d 247, 277 (2001)).  In addition, we must view any allegations of judicial bias in context and evaluate them in terms of the trial judge's " 'specific reaction to the events taking place.' "  *Id.* (quoting *Jackson*, 205 Ill. 2d at 277).

¶ 141   It has long been held that a trial judge has the right to question witnesses "to elicit the truth or to bring enlightenment on material issues which seem obscure."  *People v. Palmer*, 27 Ill. 2d

311, 314 (1963). "The propriety of such examination must be determined by the circumstances of each case, and rests largely in the discretion of the trial court." *Id.* at 315. This is especially true where the cause is tried without a jury. *Id.* To reiterate, a court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the court's view. *J.P.J.*, 2024 IL App (1st) 240157, ¶ 27.

¶ 142   In this case, defendants assert numerous alleged incidents of inappropriate behavior on the part of the trial court, but none of their claims withstand close scrutiny. First, the court's admonishment to defendant to "avoid puffery about how good [your] business is" does not establish bias. It was merely the court's reminder to defendant that he was not there to market his business; he was there to testify as to specific facts. Defendants incorrectly claim that the court's statements that "it's easy to lie" and "say whatever you want to say," were directed at defendant. They were not. A cursory reading of the report of proceedings reveals that the comments were part of an explanation—to *plaintiff's* counsel—as to why plaintiff was allowed the discovery sanction of an adverse inference being drawn when defendant failed to produce any documentation supporting his claim that he and Holdings had substantial financial resources despite multiple discovery requests and orders.[9] Defendants' complaint that the court found "that the defense was not 'credible' " occurred when the court made its findings of fact *at the end of trial*. This is not bias: it is the court's judgment after the presentation of evidence and closing arguments.

---

[9]   We note that defendant testified (in December 2022) that his accounting firm had requested an extension of time to file the 2019 and 2020 tax returns for Holdings. We question whether his accountants were able to obtain an extension for such a substantial length of time. See 26 U.S.C. § 6081 (2018) (providing that a "reasonable extension" may be granted for filing any return, declaration, statement, or other document, but that "no such extension shall be for more than 6 months"). Setting aside this implausibility, the absence of evidence supporting defendant's assertion warranted the trial court's actions and comments.

¶ 143   Defendants also complain that the trial court "repeatedly reprimanded [trial counsel] Carbonara" for asking leading questions.  No reversible error occurred, however.  First, our review of the relevant portions of the transcript shows no "reprimand" from the court.  The court merely disallowed defense counsel's repeated use of leading questions during his direct examination of defendant, which the court is permitted to do, especially in a bench trial.  See, *e.g.*, *People v. Moon*, 2019 IL App (1st) 161573, ¶ 40 (noting that a trial court " 'is permitted to make rulings without objections from counsel' ") (quoting *People v. Thigpen*, 306 Ill. App. 3d 29, 40 (1999)).  Our review of the entire context of the challenged comments reveal that the court's tone was more didactic than critical.  The court was simply explaining to trial counsel that asking nonleading questions was "how you build your case" and stating the obvious point to counsel that these types of fundamental errors can undermine the persuasive value (in the court's words, "the weight") of the evidence.  The court's comment that there was "no jury here," was made in the context of the court's attempt to explain to trial counsel that what the court needed during direct examination was "testimony * * * under oath" and not counsel's speech on the merits of his case.  The court's comment that defense counsel was not "a great artist" was also within the court's repeated admonishments to trial counsel to avoid repetitive testimony.

¶ 144   The court's question whether defense counsel took the court for a "fool," when read in context, does not indicate that it had predetermined the outcome of the case.  The court was merely expressing impatience at trial counsel's continued failure to understand that the court was not so credulous that it would merely accept defendant's unsupported testimony as to his financial strength.  Again, the court was forcefully (although arguably somewhat harshly) explaining to defense counsel that defendant's testimony as to his financial capacity would likely be of little weight because it was unsupported by any sort of corroborating evidence.  In light of defendant's

history of contradicting his prior sworn statements, the court's blunt admonishment to defendants' trial counsel did not reflect bias or favoritism toward plaintiff.

¶ 145 Defendants' complaint about the trial court stating to plaintiff's counsel that "we don't care what [defendant's] testimony is" does not constitute bias, either. The full context of the court's comments were that, if defendant's testimony differed from Kazmierczak's prior testimony, plaintiff's counsel's eliciting of repetitive testimony from Kazmierczak on rebuttal would be needlessly cumulative. Defendants' argument on this matter is thus unavailing.

¶ 146 Defendants have asserted other purported instances of bias on the part of the trial court, but we do not list all of them to avoid needlessly prolonging our discussion. We have closely examined those other instances within the full context of the record on appeal, and we hold that none of those instances were reversible error. We therefore reject defendants' contentions of error on these other instances as well.

¶ 147 Moreover, *People v. Pressley*, 160 Ill. App. 3d 858 (1987), which defendants cite in support of this claim, does not alter the outcome. There, the trial judge "effectively prevented defense counsel from cross-examining the complaining witness." *Id.* at 863. By contrast, here the trial court did not prevent defendants' trial counsel from cross-examining plaintiff's witnesses. *People v. Stokes*, 293 Ill. App. 3d 643 (1997), is similarly unavailing. That case involved a jury trial, and the court's comments included a statement that "maybe he [the trial judge] could do a better job than defense counsel." *Id.* at 648. This case was a bench trial, and the court's comments at no point suggested that it could do a better job than trial counsel. *Pressley* and *Stokes* are thus unavailing.

¶ 148 In sum, defendants accuse the trial judge of acting "like a crooked sheriff in a bad western movie from the 1950's." This accusation is not only patently incorrect; it is highly inflammatory and unprofessional. We admonish counsel to refrain from engaging in this grossly improper

advocacy in the future. Defendants' claim of improper advocacy on the part of the trial court is meritless and therefore unavailing.

¶ 149                                    3. *Jury Demand*

¶ 150   Finally, defendants contend that the trial court erred in proceeding with a bench trial despite the fact that defense counsel, Richard Carbonara, had filed a jury demand when he filed his appearance on December 21, 2020. Plaintiff responds that defendants' initial counsel filed his appearance in January 2020 as a general appearance without a jury demand, vitiating Carbonara's subsequent request, and that defendants neither sought leave to file a jury demand, nor paid the associated fees for a jury trial, nor objected at any time to the matter proceeding as a bench trial. Defendants do not address these points in their reply brief.

¶ 151   Article I, section 13, of the Illinois Constitution states that "The right of trial by jury as heretofore enjoyed shall remain inviolate." Ill. Const. 1970, art. I, § 13. Section 2-1105(a) of the Code provides in relevant part that "A defendant desirous of a trial by jury must file a demand therefor not later than the filing of his or her answer. Otherwise, the party waives a jury." 735 ILCS 5/2-1105(a) (West 2022). It is well established that the waiver provision in section 2-1105 does not violate the constitutional guarantees of trial by jury. See *Fox v. Fox*, 9 Ill. 2d 509, 514 (1956). In addition, case law suggests that jury waivers are viewed favorably. See, *e.g.*, *People v. Taylor*, 101 Ill. 2d 508, 519-20 (1984) (holding that a defendant's jury waiver, which was lodged "after the State had completed examination of its second witness," was valid).

¶ 152   Here, defendants' first counsel, Stephen Peck, filed a general appearance on January 24, 2020, but he did not make a "jury demand" at that time. As plaintiff points out, defendants' subsequent trial counsel did not seek leave to demand a jury, nor was the fee for a jury trial paid (or a waiver of that fee sought). Finally, the same trial counsel who filed the ineffective jury

demand (Carbonara) made no objection at any time, either written or oral, to the case proceeding as a bench trial. We agree that defendants' final claim of error is unavailing.

¶ 153                                    III. CONCLUSION

¶ 154   Defendants are not entitled to judgment *n.o.v.* or a new trial. The trial court's findings were not against the manifest weight of the evidence and the court's conduct of the trial did not constitute reversible error. In addition, the court did not err in calculating damages. Finally, defendants were not improperly denied a jury trial. Accordingly, we affirm the judgment of the trial court.

¶ 155   Affirmed.